988 A.2d 618

COMMONWEALTH of Pennsylvania, Appellee

v.

Richard Roland LAIRD, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 4, 2008.

Decided Feb. 16, 2010.

144

J. Michael Farrell, Philadelphia, for Richard Roland Laird.

Michelle Ann Henry, Bucks County District Attorney's Office, Amy Zapp, Harrisburg, Stephen B. Harris, Warrington, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice SAYLOR.

This is a direct appeal from a sentence of death imposed by the Bucks County Court of Common Pleas following Appellant Richard Laird's conviction of the first-degree murder of Anthony Milano.

## I. Background

In 1988, Appellant and Frank Chester were tried together for murder and related charges arising from the December 15, 1987, death of Anthony Milano. At the guilt phase, both men admitted to being present when Milano was killed, and each claimed that the other was the killer. Both were convicted on all charges, including first, second, and third-degree murder, as well as kidnapping. The jury found that the two aggravating circumstances—killing in perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6), and killing by means of torture, *see* 42 Pa.C.S. § 9711(d)(8)—outweighed the mitigating factors, and sentenced both defendants to death. On direct appeal, Appellant's judgment of sentence was affirmed. *See Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991). His

subsequent petition for post-conviction relief was denied. *See Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346 (1999).

Appellant sought federal habeas relief, which the district court granted in part. *See Laird v. Horn*, 159 F.Supp.2d 58 (E.D.Pa.2001), *aff'd*, 414 F.3d 419 (3d Cir.2005). The court vacated Appellant's first-degree murder conviction without prejudice, finding that the jury instructions on first-degree murder violated due process, but left undisturbed the other convictions, including those for second and third-degree murder. The court also vacated Appellant's death sentence based on its finding of several constitutional errors, including that Appellant's appearance before the capital sentencing jury in shackles violated his due process rights and that Appellant's counsel was ineffective for failing to investigate and present mitigating evidence of Appellant's traumatic childhood, substance abuse, intoxication, brain damage, and mental illness.

The Commonwealth retried Appellant in February 2007, nearly twenty years after the crime. The evidence adduced was similar to that introduced in the 1988 joint trial. On retrial, however, Appellant stipulated that he murdered Milano and, hence, the only remaining question for the jury was whether he acted with a specific intent to kill, thus making him guilty of first-degree murder. Appellant's strategy was to forward a defense of diminished capacity resulting from extreme intoxication. In support of such defense, Appellant presented the testimony of several expert witnesses who opined that Appellant must have had a very high blood-alcohol content at the time of the killing and that this, together with brain damage sustained from a head injury earlier in his life, substantially impeded Appellant from forming the requisite intent to kill. The experts additionally developed that, given the amount of alcohol Appellant ingested during the hours leading up to the killing, he may have been acting in an "alcoholic blackout," where he could appear to function normally but later have no recall of the time period in question. Indeed, some of the experts related that Appellant had told them he had no memory of the killing when they spoke to him immediately prior to the retrial. The district attorney sought

to cast doubt upon Appellant's truthfulness in this regard by referring to his testimony at his first trial (which occurred five months after the offense) in which Appellant recounted his version of the events immediately before, during, and after the killing in significant detail. Ultimately, the jury found Appellant guilty of first-degree murder and set the penalty at death after unanimously concluding that the sole aggravating factor outweighed any mitigating circumstances.[1]

## II. Sufficiency of the evidence

Although Appellant does not challenge the sufficiency of the evidence supporting his first-degree murder conviction, this Court undertakes such review in all cases in which the death penalty has been imposed. *See Commonwealth v. Ockenhouse*, 562 Pa. 481, 489, 756 A.2d 1130, 1134 (2000). The applicable standard is whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Watkins*, 577 Pa. 194, 208, 843 A.2d 1203, 1211 (2003). To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant was the killer, and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. §§ 2501, 2502(a); *Commonwealth v. Moore*, 594 Pa. 619, 628, 937 A.2d 1062, 1067 (2007) (citing *Commonwealth v. Collins*, 550 Pa. 46, 50, 703 A.2d 418, 420 (1997)). In undertaking this inquiry, we bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were

---

1. In view of Appellant's kidnapping conviction at his first trial, the parties stipulated to the aggravating circumstance that he killed Milano in perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). The jury did not find the other aggravating factor submitted by the Commonwealth, that the offense was committed by means of torture (*see id.,* § 9711(d)(8)). As for mitigation, the jury determined that Appellant had been the victim of an abusive childhood, that he suffered at the time of the offense from the effects of alcohol and substance abuse, and that he had a record of good conduct in prison. *See id.,* § 9711(e)(8) (the "catchall" mitigating circumstance).

correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *See Commonwealth v. Cousar*, 593 Pa. 204, 217, 928 A.2d 1025, 1032–33 (2007). Because Appellant conceded at trial that he murdered Milano, we need only inquire whether the evidence was sufficient to support the jury's determination that Appellant acted with a specific intent to kill. *See Commonwealth v. Taylor*, 583 Pa. 170, 186, 876 A.2d 916, 926 (2005) (observing that the distinguishing feature of first-degree murder is that the perpetrator acted with a specific intent to kill).[2] Viewed favorably to the Commonwealth, the evidence at Appellant's retrial revealed the following.[3]

At 11:30 p.m. on December 14, 1987, the victim, Anthony Milano, drove to the Edgely Inn in Bristol Township, a bar where Appellant and Chester were drinking and playing pool. Milano had never met Appellant or Chester prior to that evening. During the next three hours, Milano, Chester, and Appellant drank alcohol and conversed together. The bartender testified that, at some point, Appellant and Chester began taunting Milano concerning his masculinity because they believed he might be homosexual. In this respect, Appellant used derogatory terms such as "fag" when speaking of Milano to others at the bar, and at one point expressed to the bartender that he (Appellant) was "sick and tired of these

[2]. The court instructed the jury that the sole issue was whether Appellant killed Milano "with the specific intent to kill and with malice." N.T. Feb. 9, 2007, at 75. As specific-intent *murder* plainly subsumes a malicious mental state, *see generally Commonwealth v. Gay*, 489 Pa. 17, 22, 413 A.2d 675, 677 (1980) (approving a jury instruction defining murder generally as any unlawful killing with malice), our sufficiency review pertains solely to element of specific intent.

[3]. This Court previously described the underlying events as established at Appellant's first trial. *See Chester*, 526 Pa. at 586–89, 587 A.2d at 1371–72. The present summary is from the record of the second trial. During those proceedings, the Commonwealth presented testimony from various eyewitnesses who were still available, and caused the testimony of several unavailable witnesses who had testified at Appellant's first trial (including Frank Chester) to be read aloud for the jury's consideration. Additionally, although Appellant was present in court, he elected not to testify; accordingly, the Commonwealth offered his testimony from the first trial into evidence as well.

people trying to infiltrate us." Nevertheless, Milano agreed to give Appellant and Chester a ride home. Multiple witnesses testified that, during this time, and throughout the ensuing events, Appellant seemed coherent, was able to stand without swaying, and was not slurring his speech. Appellant, Chester, and Milano ultimately left the Edgely Inn just before 2:30 a.m. on December 15, with Milano driving his car and Chester and Appellant supplying directions.

Approximately one hour later, the three individuals, still in Milano's car, proceeded to a wooded area of the township, stopped along the side of the road, and exited the vehicle. Chester then punched or kicked Milano in the head several times, causing him to fall to the ground. Appellant jumped on top of Milano, pinned him to the ground, and killed him by slashing his throat repeatedly with a box-cutter. The assailants ran toward the home of a friend, Rich Griscavage. En route, Appellant took off his shirt, wiped blood from his jacket with it and discarded it. Upon arriving at Griscavage's house, Chester and Appellant were visibly agitated. Chester indicated to Griscavage that they had gotten into a fight with someone and "the dude is dead," whereupon Appellant interrupted and instructed Chester not to discuss the matter. Soon thereafter, Griscavage gave Appellant a ride home on the back of his motorcycle. He testified that Appellant did not have any trouble keeping his balance or leaning into turns, so that the ten-minute motorcycle ride was unproblematic.

Later that day, Appellant's girlfriend observed Appellant place his keychain, which was covered with blood, as well as all of the clothing he was wearing when he arrived home, into a plastic bag, which he then discarded in a dumpster in a nearby town. She testified that he always carried his box-cutter with him, but that he disposed of it after the murder by throwing it into a creek. Additionally, Appellant asked her if she could "be an alibi," repeated his instruction to Chester not talk to anyone about the incident, and stated, "no evidence, no crime." Finally, the Commonwealth introduced a tape recording and transcript of a consensually intercepted telephone call between Chester and Appellant on December 20, 1987. During the

call, Appellant suggested that Chester leave town, indicated his intention to "hide until this blows over," recommended ways of passing a polygraph test, commented on the district attorney's inability to prove a case without evidence, and expressed his belief that criminal homicide is subject to a seven-year statute of limitations. Two days later, Appellant was arrested at a motel in Falls, Pennsylvania.

This Court has already concluded that the slashing of Milano's throat supports an inference that the killing was intentional. *See Chester*, 526 Pa. at 589, 587 A.2d at 1372; *see also Commonwealth v. Kennedy*, 598 Pa. 621, 630, 959 A.2d 916, 921 (2008) (noting that a specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the victim's body). Thus, the sole question for sufficiency purposes is whether the evidence at the retrial was adequate to sustain the jury's determination that, notwithstanding the undisputed fact that Appellant had consumed a large number of alcoholic beverages, he nonetheless was able to, and did, form a specific intent to kill at the time he murdered Milano. *See Commonwealth v. Christy*, 540 Pa. 192, 211, 656 A.2d 877, 886 (1995) (observing that when the defendant raises diminished capacity defense to first-degree murder, the Commonwealth bears the burden of disproving the defense beyond a reasonable doubt); *see also Commonwealth v. Beasley*, 544 Pa. 554, 574, 678 A.2d 773, 783 (1996).[4]

Although Appellant presented substantial expert evidence concerning his alleged inability to form a specific intent or to remember the murder, the jury was not required to place determinative weight upon those proofs; rather, it "was

4. The trial court instructed the jury concerning the Commonwealth's burden of proof in this respect. *See Commonwealth v. Markman*, 591 Pa. 249, 284, 916 A.2d 586, 607 (2007) (recognizing that a defendant is entitled, on request, to a jury charge concerning any defense to criminal culpability for which supporting evidence is introduced). The court also explained that first-degree murder represents an exception to the general rule that a defendant cannot escape liability based on voluntary intoxication, as a first-degree murder conviction requires the finding of a specific intent to kill. *See* N.T. Feb. 9, 2007, at 79–81; *accord* 18 Pa.C.S. § 308; *Commonwealth v. Breakiron*, 524 Pa. 282, 295–96, 571 A.2d 1035, 1041 (1990).

free to believe all, part or none of the defense testimony." *Commonwealth v. Vandivner*, 599 Pa. 617, 631, 962 A.2d 1170, 1178 (2009). The jury was aware that Appellant: appeared coherent to various witnesses before and after the incident; told the bartender of his antipathy toward a class of individuals to which he believed Milano belonged; spoke to Chester about the murder shortly after it occurred and took steps to conceal his involvement in it, *see Commonwealth v. Johnson*, 576 Pa. 23, 53, 838 A.2d 663, 681 (2003) (indicating that flight and concealment can constitute circumstantial proof of consciousness of guilt); and testified about the incident in detail five months after the fact. Under these circumstances, the jury could reasonably have concluded that the Commonwealth proved beyond a reasonable doubt that Appellant's killing of Milano was willful, deliberate, and premeditated, notwithstanding his intoxication and prior head injury. *See* 18 Pa. C.S. § 2502 (providing that criminal homicide constitutes first-degree murder when committed by an "intentional killing," that is, a "willful, deliberate and premeditated killing"); *Commonwealth v. Keaton*, 556 Pa. 442, 455, 729 A.2d 529, 536 (1999). We find this evidence to be an adequate foundation for the jury's verdict.

## III. Appellant's claims

### 1. Double jeopardy

■ Appellant first claims that his judgment of sentence should be reversed because double jeopardy principles barred the district attorney from retrying him for first-degree murder. As Appellant's initial conviction was vacated due to trial error rather than evidentiary insufficiency, he does not predicate his argument on the fact that he was previously tried for first-degree murder.[5] Rather, his theory is that, under Sec-

---

5. *See Chester*, 526 Pa. at 589, 587 A.2d at 1372 (holding that the evidence adduced at the first trial was sufficient to sustain Appellant's first-degree murder conviction); *accord Laird*, 555 Pa. at 648, 726 A.2d at 355. *See generally Oregon v. Kennedy*, 456 U.S. 667, 676 n. 6, 102 S.Ct. 2083, 2090 n. 6, 72 L.Ed.2d 416 (1982) ("This Court has consistently held that the Double Jeopardy Clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in

tion 109 of the Crimes Code, the Commonwealth was unable to retry him for first-degree murder in view of his subsisting convictions for second- and third-degree murder. In particular, Appellant observes that Section 109 bars a second prosecution based upon the same facts and "for a violation of the same provision of the statutes" as an earlier prosecution, where the first prosecution resulted in a conviction that has not been reversed or vacated. 18 Pa.C.S. § 109(3). As applied here, Appellant recites that his convictions for second- and third-degree murders have not been reversed or vacated, and contends that they resulted from a violation of the "same provision" as the present first-degree murder conviction. *See* 18 Pa.C.S. § 2502(a), (b), and (c) (prohibiting first, second, and third-degree murder, respectively). This contention is in error, however, as the "same provision" phraseology of Section 109(3) refers to the same offense, and not merely the same section of the Crimes Code. *See* 18 Pa.C.S. § 109, official cmt. (clarifying that the purpose of subsection (3) is to codify the existing rule that "a former conviction of the accused bars a later prosecution of him for the *same offense* " (emphasis added)); *accord id.*, § 110(1) (affirming that Section 109 addresses a second prosecution for the same offense as a former one). Thus, because the three types of murder proscribed by Section 2502 constitute distinct offenses, Section 109(3) did not prohibit the Commonwealth from retrying Appellant for first-degree murder.

 Anticipating this result, Appellant proffers in the alternative that his retrial should nonetheless have been precluded by Section 110 of the Crimes Code, which describes when a later prosecution is barred by a former prosecution for a different offense. *See* 18 Pa.C.S. § 110. That provision, however, reflects Pennsylvania's compulsory joinder rule, which is designed to protect a defendant's double-jeopardy interests where the Commonwealth initially declines to prosecute him for the present offense, electing to proceed on different charges stemming from the same criminal episode. *See Commonwealth v. Bracalielly,* 540 Pa. 460, 470, 658 A.2d

persuading a court to set his conviction aside, unless the conviction has been reversed because of the insufficiency of the evidence.").

755, 760 (1995); *Commonwealth v. Hude,* 500 Pa. 482, 488–89, 458 A.2d 177, 180 (1983).[6]

 Notably, Appellant does not reference any authority suggesting that Section 110 applies where, as here, the Commonwealth prosecuted the defendant on the present charges and the resulting conviction was later vacated due to trial error. Rather, he argues that Section 110 pertains because, on its face, it precludes prosecution relative to an offense of which the defendant "could have been convicted" in the first proceeding, 18 Pa.C.S. § 110(1)(i), or an offense that is "based on the same conduct or arising from the same criminal episode" as the existing convictions, *id.,* § 110(1)(ii), (iii). In this respect, Appellant states that he plainly "could have been convicted" of first-degree murder in the first trial, because he *was* convicted of that offense in the first trial, and that there is no dispute that his present conviction and his prior ones arose from the same criminal episode. *See* Brief for Appellant at 21. Appellant's position, while perhaps creative, is unavailing: in addition to straining the statutory text, it cannot be reconciled with this Court's explanation that Section 110 embodies a rule of compulsory joinder (or compulsory consolidation), *see, e.g., Commonwealth v. Failor,* 564 Pa. 642, 647, 770 A.2d 310, 313 (2001); *Bracalielly,* 540 Pa. at 470, 658 A.2d at 760, and hence, can only logically apply in a situation where the challenged conviction is for an offense that the Commonwealth did not pursue in the initial proceedings.

## 2. First-degree murder as the sole available offense

 Next, Appellant argues that the trial court erred by failing to instruct the jury that it could find Appellant guilty of

6. *Accord Commonwealth v. Holmes,* 480 Pa. 536, 540–41, 391 A.2d 1015, 1017 (1978); *Commonwealth v. Campana,* 452 Pa. 233, 251, 304 A.2d 432, 440 (1973); *cf. Commonwealth v. Tarver,* 467 Pa. 401, 408, 357 A.2d 539, 543 (1976) ("The rule was not intended to intrude upon situations where there is a legitimate reason for separate disposition."). *See generally Commonwealth v. Anthony,* 553 Pa. 55, 63, 717 A.2d 1015, 1019 (1998) (reciting that Section 110's dual policy objectives are to protect a defendant from the "governmental harassment of being forced to undergo successive trials for offenses stemming from the same criminal episode," and to "assure finality without unduly burdening the judicial process by repetitious litigation.").

a lesser offense than first-degree murder. He relies on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), which held that, where the prosecution seeks a conviction for a capital offense, the jury must be instructed concerning a "third option" between conviction on such charge and full acquittal, whereby the defendant can still be found guilty of a violent felony, but one that is not capital in nature. The Court reasoned that failing to provide such an option may enhance the risk of an unwarranted conviction. *See id.* at 637, 100 S.Ct. at 2389. The present case, however, is readily distinguishable from *Beck.* First, the Commonwealth lacked authority to retry Appellant for second- or third-degree murder, as his convictions for those offenses were left undisturbed. *See Spaziano v. Florida,* 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984) (clarifying that, where no lesser-included offense is available, the *Beck* rule does not apply because an instruction on such an offense would detract from, rather than enhance, the rationality of the process). Also, the trial court in the present case informed the jury that an acquittal would not result in Appellant being placed at liberty. The court instructed:

> The only issue that you'll have to decide during this trial is whether [Appellant] is guilty of first degree murder. If you decide that he is not guilty of first degree murder, [Appellant] will not be released from custody. He will receive a life sentence from this Court for another degree of murder in connection with the death of Anthony Milano.... In this case everyone agrees or it is conceded that Anthony Milano is dead and that [Appellant] killed him. The sole issue for your determination is whether [Appellant] did so with the specific intent to kill and with malice.

N.T. Feb. 7, 2007, at 23–24.[7] Thus, unlike in *Beck,* the jury was aware that an acquittal of first-degree murder would result in Appellant's continued incarceration for a lower degree of murder. Even if a *Beck* issue were present, moreover,

---

7. Appellant's previous challenge to the consistency of the three murder verdicts was decided in the Commonwealth's favor, *see Laird,* 555 Pa. at 648, 726 A.2d at 355; *Laird v. Horn,* 159 F.Supp.2d at 89–90, and he does not presently renew that challenge.

it is waived because Appellant specifically requested that the court instruct the jury in the precise manner that he now challenges. *See id.* at 11–12.

Still, Appellant posits that, because the above instruction was provided at the beginning of a week-long trial, by the time the jurors retired to deliberate they might have forgotten that Appellant would remain incarcerated even if they returned a not-guilty verdict. *See* Brief for Appellant at 24–25. It is settled law that, absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions, *see Commonwealth v. O'Hannon,* 557 Pa. 256, 262, 732 A.2d 1193, 1196 (1999), and Appellant does not point to any evidence to the contrary. In suggesting that the jurors might have forgotten the substance of the above charge, moreover, Appellant overlooks that his attorney, in the guilt-phase summation, reiterated to the jury that "[t]he defendant is guilty of murder. He along with Frank Chester killed Anthony Milano. There's no question about it. There's no issue about it. *He will spend the rest of his life in jail regardless of your decision in this case.*" N.T. Feb. 9, 2007, at 6 (emphasis added). This undermines the factual basis for any assertion predicated upon possible juror forgetfulness.

## 3. Confrontation rights

By way of background, during Appellant's second trial Frank Chester was placed on the witness stand outside the jury's presence and, upon being questioned, exercised his Fifth–Amendment privilege against self-incrimination by refusing to answer all questions. After defense counsel agreed that Chester was thus unavailable, *see* N.T. Feb. 7, 2007, at 16; *supra* note 3, Chester was seated in the general audience section of the courtroom for later identification by the arresting officer.[8] Thereafter, the jury returned and the arresting

---

8. The Commonwealth does not dispute that Chester was unavailable. *Accord Commonwealth v. Rodgers,* 472 Pa. 435, 453, 372 A.2d 771, 779 (1977) (plurality opinion) (citing federal cases); *Commonwealth v. Colon,* 461 Pa. 577, 583, 337 A.2d 554, 557 (1975) (plurality opinion) (citing treatises); *see United States v. Salerno,* 505 U.S. 317, 321, 112 S.Ct. 2503, 2507, 120 L.Ed.2d 255 (1992) (assuming for appellate

officer testified concerning his having apprehended Appellant and Chester, identifying the latter by pointing out his presence in the courtroom. Chester was then removed from the courtroom, and his testimony from the first trial, including both direct and cross-examination testimony, was read aloud for the jury's consideration.[9] Based on these procedures, Appellant asserts that he was denied his constitutional right to cross-examine Chester.

To ensure a fair and reliable trial, the Sixth Amendment guarantees criminal defendants the right to confront and cross-examine adverse witnesses. *See* U.S. CONST. amend. VI; *Commonwealth v. Overby*, 570 Pa. 328, 337, 809 A.2d 295, 300 (2002). *See generally Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965) (applying the Confrontation Clause to the States through the Fourteenth Amendment). Therefore, the prior testimony of a presently-unavailable witness may be used only where the party against whom the testimony is offered "had an adequate opportunity and similar motive to develop the testimony by direct, cross, or

purposes that a declarant who asserted his Fifth–Amendment privilege was unavailable where the parties did not contest the fact). The trial court had previously ruled that Chester would become unavailable upon asserting his privilege. *See* N.T. Dec. 13, 2006, at 7; Pa.R.E. 804(a) (defining unavailability to include situations where the declarant "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement"); *see also Commonwealth v. Bazemore*, 531 Pa. 582, 585, 614 A.2d 684, 685 (1992) ("A witness who invokes his or her Fifth Amendment privilege is deemed 'unavailable' for the purpose of testifying provided the court first determines that the witness' concern with self-incrimination is legitimate."). *See generally* FED R.EVID. 804 advisory committee's note ("Substantial authority supports the position that exercise of a claim of privilege by the declarant satisfies the requirement of unavailability."); W.J. Dunn, *Claim of privilege by a witness as justifying the use in criminal case of his testimony given on a former trial or preliminary examination*, Annot., 45 A.L.R.2d 1354 (1956 & Supp.).

9. Before Chester's testimony was introduced, the trial court cautioned the jury that Chester had been convicted of murder at a prior proceeding, that he was an accomplice, and that his testimony should therefore be viewed "with disfavor because it comes from a corrupt and polluted source." N.T. Feb. 7, 2007, at 131–32. Defense counsel stated he was satisfied with that instruction, *see id.* at 132, although he did not waive his objection to the introduction of such testimony as initially lodged in pretrial motions. *See* N.T. Dec. 13, 2006, at 15.

redirect examination." Pa.R.E. 804(b)(1); *see Commonwealth v. Bazemore*, 531 Pa. 582, 588, 614 A.2d 684, 687 (1992); *Commonwealth v. Paddy*, 569 Pa. 47, 78, 800 A.2d 294, 313 (2002).[10]

As applied presently, Appellant maintains that his rights were violated because, although he was able to cross-examine Chester at the first trial, he lacked a "similar motive to develop" Chester's testimony. His theory is that the contested factual issue at the first trial was whether he (Appellant) killed Milano,[11] whereas at retrial Appellant admitted to having murdered Milano and sought only to show he could not have formed a specific intent to kill. Thus, Appellant urges that his cross-examination of Chester at the first trial did not touch upon factual circumstances that became relevant during the retrial, such as his head injuries, alcohol and drug addiction, and state of intoxication at the time of the offense. Appellant observes, in support of this theory, that the federal district court found that his prior attorney provided ineffective assistance during the penalty hearing of the first proceeding by failing to develop evidence concerning his background and medical history. *See Laird*, 159 F.Supp.2d at 116–17.

Although Appellant's counsel at the first trial did not explore whether Appellant's ability to form a specific intent to kill might have been impaired, he was able fully and fairly to test the veracity of Chester's assertions as required by the

10. In *Bazemore*, this Court excluded the testimony at issue because the Commonwealth had withheld crucial impeachment evidence, thereby depriving counsel in the earlier hearing of an opportunity to engage in "full and fair" cross-examination. *See id.* Subsequently, *Paddy* permitted the introduction of prior testimony from an unavailable witness where the defense attorney at the former hearing lacked some damaging information concerning the witness, but possessed other data which he put to effective use. *See Paddy*, 569 Pa. at 78–79, 800 A.2d at 313. There is no contention in the present dispute that any impeachment or other relevant evidence concerning Chester was withheld from Appellant's counsel at his first trial, or that prior counsel was otherwise constrained from fully questioning Chester during cross-examination.

11. At his first trial, Appellant testified that he had no intention of harming Milano, and that Chester had done the killing. *See* N.T. May 18, 1988, at 548. Chester testified that the opposite had occurred. *See id.* at 478–80.

Confrontation Clause. At the first trial, the prosecutor and
Appellant's attorney both vigorously cross-examined Chester
in a manner aimed at exposing inconsistencies in his version of
the events and otherwise undermining his believability—and
in the case of Appellant's attorney, portraying Appellant as
innocent of the murder. *See, e.g.,* N.T. May 18, 1988, at 539
(eliciting that, when Appellant stated during the intercepted
phone call, "I didn't kill nobody man, I ain't got it in me to kill
somebody, you know?," Chester responded, "Yeah. All right.").
During such cross-examination, moreover, which comprised 53
pages of transcript, both attorneys were interested in depict-
ing Chester as unworthy of belief, and their questioning
brought to light that: Chester had lied to the police on several
occasions; his account of the assault could not be reconciled
with the injuries sustained by the victim; and he eventually
decided to cooperate with authorities by placing the intercept-
ed phone call solely in an effort to obtain leniency for himself.
In light of the above, Appellant does not claim that he lacked a
fair opportunity for cross-examination; rather, his essential
contention appears to be that no amount of cross-examination
of Chester at the first trial would be sufficient to cure the
present Confrontation Clause difficulty because the relevant
issue in the second trial was whether Appellant lacked the
ability to form an intent to kill at the time of the incident, and
the cross-examination of Chester at the first trial did not
address that question. *See* Brief for Appellant at 30–31.

While Appellant is correct in stating that the topic of his
alleged diminished capacity was not discussed during Ches-
ter's cross-examination, it does not follow that his confronta-
tion rights were thereby violated. As explained, the require-
ment of a full and fair opportunity for cross-examination was
satisfied relative to the factual issues that were raised on
direct examination. In addition, counsel's ability to develop
evidence through cross-examining Chester to support a dimin-
ished capacity claim would have been severely restricted, if
not precluded, for multiple reasons. First, Appellant elected
to interpose a defense of complete innocence at his first trial.
This would have rendered any evidence on diminished capacity

inadmissible. *See Laird,* 555 Pa. at 645, 726 A.2d at 353 ("A defense of diminished capacity is only available to a defendant who admits criminal liability but contests the degree of guilt."). Additionally, on direct examination Chester's counsel did not ask Chester about Appellant's psychological or medical background, and thus, these issues could not have been addressed on cross-examination. *See* Pa.R.E. 611(b) (generally restricting the scope of cross-examination to matters discussed during direct examination and matters affecting credibility). It bears noting, as well, that Chester was not an expert witness, and as such, would not have been able to offer psychological or psychiatric expert testimony concerning a diminished capacity defense; indeed, Appellant neglects to specify exactly what Chester could have said during cross-examination that would have added material support to his diminished-capacity defense forwarded during the second trial.[12]

In this respect, it is worth observing that the Sixth Amendment's prerequisites for the admission of prior testimony, as well as those of our evidentiary rules—including the "similar motive" qualifier on which Appellant relies, *see* Pa. R.E. 804(b)(1)—are aimed at assuring that the jury is not exposed to an insufficiently tested declaration of an unavailable adverse witness; such constraints do not amount to mere

12. At the retrial, moreover, Appellant called three forensic psychiatric and psychological expert witnesses who testified at length concerning his mental health difficulties, brain injuries, and heavy drug and alcohol usage. These experts opined, *inter alia,* that Appellant had a blood-alcohol content of approximately 0.45 percent at the time of the murder and that, given his brain damage, his ability to form a specific intent to kill with that level of intoxication would have been significantly impaired or non-existent. Indeed, there was no dispute at the retrial that Appellant was highly intoxicated at the time of the killing. Furthermore, during the defense case, counsel read to the jury a portion of a sworn declaration executed by Chester during Appellant's PCRA proceedings in which Chester recounted Appellant's severe intoxication on the night in question, ultimately concluding that " 'Rick was drunk out of his mind. By the end of that evening, Rick could barely walk.' " N.T. Feb. 8, 2007, at 14 (quoting Chester Declaration at ¶ 7). Accordingly, and as noted above, it is difficult to see how any omission in prior counsel's cross-examination of Chester concerning Appellant's present diminished capacity defense could have substantially impeded Appellant from developing that defense at his retrial.

162

abstract conceptions designed to exclude prior testimony based on factors that could not have affected the adversarial testing process. *See, e.g., Bazemore,* 531 Pa. at 587, 614 A.2d at 687 (indicating that the former-testimony exception to the hearsay rule is "predicated on the 'indicia of reliability' normally afforded by adequate cross-examination" (quoting *Commonwealth v. Mangini,* 493 Pa. 203, 213, 425 A.2d 734, 739 (1981))). Because Chester was thoroughly cross-examined at the first proceeding, and it remained undisputed at retrial that Appellant was highly intoxicated on the night of the incident, Appellant has not adequately explained how the alleged lack of a similar motive for cross-examination meaningfully affected that process.

Our conclusion is not altered, moreover, by the federal district court's determination that prior counsel rendered ineffective assistance in the penalty phase of the first trial. The basis for that finding was that counsel did not adequately investigate or develop available life-history and medical-history mitigation. As expressed above, such evidence would not have been relevant to Appellant's innocence defense advanced during the guilt phase, as the District Court acknowledged. *See Laird,* 159 F.Supp.2d at 115 ("[Appellant] and trial counsel decided to present an innocence defense during the guilt phase as opposed to, for example, a diminished capacity defense that might require evidence of [Appellant]'s mental and emotional health.").

Accordingly, consistent with *Paddy,* 569 Pa. at 78–80, 800 A.2d at 313–14, we find that Appellant had a full and fair opportunity to cross-examine Chester during the first trial, and hence, that the trial court did not err in admitting Chester's testimony from that proceeding.[13]

13. As part of this claim, Appellant also includes a separate contention that the trial court should not have allowed Chester to be seated in the courtroom for identification by the arresting officer. He argues that, "[s]ince the gravamen of the Commonwealth's case was that Appellant was *more* guilty than Chester, and Chester was displayed to the jury as someone who is guilty of murder and quite dangerous, the prejudice to Appellant is palpable." Brief for Appellant at 29 (emphasis in original). Whatever merit this contention may or may not have, Appellant failed

### 4. Speedy trial rights

 Appellant next contends that his judgment of sentence should be reversed because his right to a prompt trial under criminal procedural rule 600 was violated.[14] Although his advocacy on this claim is somewhat disorganized, *see* Brief for Appellant at 34–38, the substance of his assertion appears to have two parts. First, he argues that the trial court should have dismissed the first-degree murder charge because his trial did not commence within the 365 days required by Rule 600. *See* Brief for Appellant at 35 (citing *Commonwealth v. Solano*, 588 Pa. 716, 728–32, 906 A.2d 1180, 1187–89 (2006)). He maintains that the 365–day period began on July 19, 2005—the date the Third Circuit rendered its decision affirming the United States District Court's grant of guilt-phase relief—thereby giving rise to a mechanical run date of July 19, 2006. *See Solano*, 588 Pa. at 731 n. 8, 906 A.2d at 1188 n. 8 (explaining that the mechanical run date is the date by which trial is required to commence). Appellant observes, in this respect, that his second trial did not begin until February 2007, well past the mechanical run date. The Commonwealth responds that the 365–day period did not begin until February 15, 2006, the date the United States District Court's docket sheet reflects that the record was actually remanded to the Court of Common Pleas.[15]

Initially, we note that the 365–day restriction, on its face, applies to defendants who are released on bail. *See* Pa. R.Crim.P. 600(A)(3), (D)(2, 3), (G). As capital defendants are not eligible for bail, *see* PA. CONST. art. I, § 14, it is not facially apparent that the 365–day rule can have any application to the present case. However, Appellant colorably argues that it can apply in view of case law indicating that the 365–day period of

to preserve it for review by lodging a timely objection. *See* N.T. Feb. 7, 2007, at 16–22.

14. Appellant proceeds only under Rule 600, and does not raise a separate speedy-trial claim based solely on the Constitution.

15. The Supreme Court had denied the Commonwealth's petition for a writ of *certiorari* on January 17, 2006, *see Beard v. Laird*, 546 U.S. 1146, 126 S.Ct. 1143, 163 L.Ed.2d 1014 (2006), which presumably explains the February 15, 2006 date for the remand of the record.

Rule 600(A)(3) or Rule 600(G) operates as a safety valve for capital defendants held on their initial charges who are not tried within the requisite 180–day time period, *see* Pa. R.Crim.P. 600(A)(2), even though those defendants are not eligible for the remedy of nominal bail specified in Rule 600(E). *See Solano,* 588 Pa. at 729, 906 A.2d at 1188; *Commonwealth v. Boczkowski,* 577 Pa. 421, 434, 846 A.2d 75, 83 (2004). Additionally, the Commonwealth appears to accept this legal position. *See* Brief for Commonwealth at 52 ("The Commonwealth agrees that once the 365 days of Rule 600 have expired, there is an issue at hand with regard to dismissal, and *Solano* confirms this.").

Still, even accepting, *arguendo,* Appellant's premise that Rule 600(D)(2)'s 365–day limitation applies to his retrial and began to run on July 19, 2005, we cannot conclude that Appellant suffered a speedy-trial violation in the circumstances of this case, as he expressly waived any delay past June 29, 2006. *See* Pa.R.Crim.P. 600(C)(2) (providing that any time expressly waived by the defense is excluded from the period for commencement of trial). In particular, Appellant appeared before the trial court *pro se* on June 29, 2006—less than a year after the Third Circuit's July 19, 2005, decision—and moved for the appointment of new counsel.[16] The trial court granted Appellant's motion, formally appointed new counsel, and noted that the Commonwealth was ready to proceed to trial. *See* N.T. June 29, 2006, at 3. Appellant promptly sought a continuance and expressly waived on the record his speedy trial rights until the commencement of trial. *See id.* at 6.

This Court previously addressed a similar situation, and explained that

> where, as here, an accused appears for a court proceeding without counsel and without waiving his right to counsel, the period of delay caused thereby is excludable from the

---

**16.** Appellant was *pro se* at this juncture because his federal habeas counsel was permitted to discontinue his representation after June 1, 2006. Although Appellant's new counsel was with him at the beginning of the proceeding on June 29, he was not formally appointed on the record until after that proceeding commenced.

computation of time for commencing trial under Rule 1100 [now Rule 600] on the ground that the accused is obviously unavailable for trial.

*Commonwealth v. Manley*, 503 Pa. 482, 485, 469 A.2d 1042, 1044 (1983). Thus, in view of Appellant's express waiver—and pursuant to the terms of Rule 600(C)(2)—only the period from July 19, 2005, to June 29, 2006, is chargeable to the Commonwealth. *Accord Boczkowski*, 577 Pa. at 436, 846 A.2d at 84. As that interval is less than one year, no violation of the 365–day rule as envisioned by the parties occurred.[17]

The second part of Appellant's prompt-trial claim is forwarded in the alternative under Rule 600(D)(2)'s 120–day rule for individuals who are not released on bail. That provision states, in relevant part:

When an appellate court has remanded a case to the trial court, if the defendant is incarcerated on that case, trial shall commence within 120 days after the date of remand as it appears in the appellate court docket.

Pa.R.Crim.P. 600(D)(2).

▆ Appellant indicates that, even if relief is denied on his claim predicated on the 365–day rule, some form of relief is due him under Rule 600(D)(2)'s 120–day limitation, since it is undisputed that more than 120 days passed between the Third Circuit's ruling and the June 29, 2006, hearing at which Appellant waived his speedy-trial rights going forward. Appellant states that the ordinary remedy for cases where trial commences between 120 and 365 days after remand is release on nominal bail, *see* Brief for Appellant at 37 (citing *Commonwealth v. Montgomery*, 861 A.2d 304, 309 (Pa.Super.2004)), and argues that, since bail is not available in capital cases, this Court should instead vacate his death sentence. *See id.* at 38.

17. Notwithstanding his express waiver, Appellant asks this Court to find a prompt trial violation based on *Commonwealth v. Eskridge*, 529 Pa. 387, 604 A.2d 700 (1992). *Eskridge* is readily distinguishable, however. In that matter, the Commonwealth caused the delay at issue by failing to refer the prosecution to the Attorney General's office in a timely manner. Here, Appellant's need to substitute counsel was not due to any omission on the part of the Commonwealth.

Although Appellant does not convincingly explain why vacating his death sentence would be appropriate as a substitute for release on nominal bail, again, we need not finally decide the merits of such claim, as we conclude that no 120–day violation occurred. During the June 29, 2006, proceedings, Appellant asked the court to release him on bail pending his retrial on the first-degree murder charge. A discussion ensued in which the prosecutor and defense counsel disagreed concerning whether Appellant was eligible for bail. *See* N.T. June 29, 2006, at 9. However, when the Commonwealth informed the court that, in any event, Appellant was still serving his prison sentence for kidnapping Milano, the Court ruled that the question of bail was premature, as Appellant had not applied for parole relative to the kidnapping sentence. *See id.* at 9. Thus, after the record was remanded to the common pleas court, Appellant was not "incarcerated on that [murder] case," but rather, on the kidnapping case. Accordingly, Rule 600(D)(2)'s 120–day constraint was not implicated, and Appellant's claim based on that provision fails.

### 5. Motion to preclude impeachment evidence

Next, Appellant claims that he should be awarded a new trial because the common pleas court erroneously denied his pretrial motion *in limine* to preclude the Commonwealth from introducing certain impeachment evidence should he decide to testify in his own defense. The evidence at issue is proof of his prior convictions, in 1984, 1986, and 1987, for *crimen falsi* offenses such as theft and receiving stolen property. Admission of such prior convictions is permitted in accordance with the following parameters:

(a) **General rule.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime ... shall be admitted if it involved dishonesty or false statement.

(b) **Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that convic-

tion, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. . . .

Pa.R.E. 609(a), (b). Appellant's specific focus is on the court's weighing exercise undertaken pursuant to Rule 609(b), as the parties agree that the convictions were not *per se* admissible under Rule 609(a) due to their age. Appellant states that the trial court erred in concluding that the probative value of the evidence outweighed its prejudicial effect because, in his view, all of the relevant factors that this Court has delineated militated against admission. *See* Brief for Appellant at 40–43.[18]

The Commonwealth counters that the trial court acted within its discretion in allowing the convictions under Rule 609(b), as the prior offenses did not suggest a propensity to commit first-degree murder and, moreover, Appellant's credibility was an issue on retrial because the jury had to determine whether he had the specific intent to kill Milano. The Commonwealth additionally highlights the trial court's observation that it permitted Appellant to renew his *in limine* motion at the conclusion of the Commonwealth's case, but that Appellant chose not to do so, *see* Brief for Commonwealth at 56 (quoting *Commonwealth v. Laird*, Crim. No.1988–746, at 31 (C.P.Bucks, July 26, 2007)), and posits that, after the Commonwealth had rested its case, Appellant most likely decided not to testify because, at that point, he knew that he could be

18. Appellant notes that, in *Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987), this Court enumerated several factors as relevant in determining whether convictions that fall within the "exception category" of Rule 609(b) are admissible. *Id.* at 415, 528 A.2d at 1328–29. These include the degree to which the prior offenses reflect upon the defendant's veracity; the likelihood that the convictions would have a greater tendency to smear the defendant's character and suggest a propensity to commit the crime charged rather than provide a legitimate reason for discrediting his testimony; the age and circumstances of the defendant; the strength of the prosecution's case and its need to resort to the prior-conviction evidence; and the existence of alternative means of attacking the defendant's credibility. *See id.* at 413, 528 A.2d at 1328 (quoting *Commonwealth v. Roots*, 482 Pa. 33, 39–40, 393 A.2d 364, 367 (1978)).

cross-examined with his prior testimony, which advanced a contradictory defense. *See id.* at 57. We will address this latter contention first, as it raises an issue that we find dispositive.

Preliminarily, we note that the decision to admit or exclude evidence is committed to the trial court's sound discretion and its evidentiary rulings will only be reversed upon a showing that it abused that discretion. Such a finding may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Sherwood*, 603 Pa. 92, 112, 982 A.2d 483, 495 (2009). Furthermore, an erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt. *See Commonwealth v. Markman*, 591 Pa. 249, 277, 916 A.2d 586, 603 (2007). Here, Appellant is requesting relief based on the trial court's decision to allow the admission of evidence that was never actually admitted. Recognizing this feature of the case, Appellant contends that he was prejudiced because he would have exercised his right to testify in his own defense if he had known that the Commonwealth would have been precluded from impeaching his credibility with his prior convictions. The difficulty with this factual premise is that the record does not adequately support it. To understand why, some further background is helpful.

On December 13, 2006, several weeks before trial, the common pleas court convened a hearing to discuss various pretrial motions, including Appellant's *in limine* motion to exclude his *crimen falsi* convictions. The Commonwealth requested that the trial court reserve judgment on the motion until after Appellant actually testified, and defense counsel stated that he would not oppose such a course of action. *See* N.T. Dec. 13, 2006, at 5. The trial court indicated, however, that waiting until after Appellant's testimony was unsatisfactory, as it would deprive Appellant of the ability to make an intelligent decision as to whether or not to testify. The court

then expressed its tentative view that the Commonwealth would probably be entitled to introduce the convictions, but qualified its position by observing that it did not know what evidence would be elicited at trial, and so it would permit Appellant to renew the motion at the conclusion of the Commonwealth's case. *See id.* at 6. As discussed, Appellant did not renew his motion after the Commonwealth rested; further, he did not provide any explanation on the record for his failure to renew.

We conclude, initially, that the trial court did not err in deferring a definitive ruling on the motion until the close of the Commonwealth's case-in-chief: the court was aware that, at that juncture, it would be able to re-assess its preliminary determination in light of the evidence adduced during the prosecution's case. The court was additionally cognizant that, as the trial developed, the defense might change its strategy and ultimately decide for independent reasons that it would be best for Appellant not to testify, thereby mooting the issue. *See id.* (reflecting the trial court's statement that "I don't know what's going to be developed at trial, and I will allow as [sic] to renew this [motion] at the conclusion of the Commonwealth's case *should you wish to renew it.*" (emphasis added)). Appellant does not presently argue that he was unable to renew his motion, or proffer any reason why the trial court was obligated to make a final decision at the December 13th pretrial hearing, nor has he elected to file a reply brief disputing the Commonwealth's theory that he ultimately decided not to testify because he knew that any testimony supporting his diminished capacity defense was susceptible of impeachment with his testimony from the first trial.

The Superior Court faced a nearly identical situation in *Commonwealth v. Bellamy,* 293 Pa.Super. 95, 437 A.2d 1007 (1981), and explained that "we cannot tell from the record why counsel did not renew the motion to suppress, nor whether his failure to do so was a substantial factor in appellant's decision not to testify. Accordingly, we must remand for an evidentiary hearing." *Id.* at 96, 437 A.2d at 1008 (citing, *inter alia, Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977)).

On remand, new counsel was appointed so that Bellamy could pursue an ineffective assistance of counsel claim based on his trial counsel's failure to renew the motion to exclude the evidence of his prior convictions. *See Commonwealth v. Bellamy*, 321 Pa.Super. 471, 468 A.2d 806 (1983) (opinion after remand). We find the Superior Court's reasoning and disposition appropriate, except that the *Hubbard* rule has since been replaced by the rule established in *Commonwealth v. Grant*, 572 Pa. 48, 67, 813 A.2d 726, 738 (2002), pursuant to which any remaining claim predicated on ineffective assistance must await collateral review. That is the only remaining potential claim stemming from Appellant's motion *in limine;* it is not raised presently and, as noted, could not be resolved during the present appeal even if it had been raised.

## 6. Trial court's reference to an objection being preserved for appeal

Appellant's next contention is that his judgment of sentence should be reversed because during trial, the court mentioned to counsel, with the jury present, that one of his prior objections was "preserved for appeal." N.T. Feb. 5, 2007, at 93. Counsel spoke to the court at sidebar concerning the remark and requested a mistrial. The court denied the request, assured counsel that it would not use that phraseology again, and offered to give the jury a curative instruction. Counsel declined the offer because he felt that such an instruction might do more harm than good by highlighting the remark. *See id.* at 138–41. Appellant claims that the denial of the mistrial motion was prejudicial error.

A mistrial is an "extreme remedy" that is only required where the challenged event deprived the accused of a fair and impartial trial. *Commonwealth v. Boczkowski*, 577 Pa. 421, 454, 846 A.2d 75, 94 (2004). The denial of a mistrial motion is reviewed for an abuse of discretion. *See Commonwealth v. Jones*, 542 Pa. 464, 488–89, 668 A.2d 491, 502–03 (1995). Remarks that lead the jury to believe that it is not the final arbiter of the death penalty are impermissible, as they tend to minimize the jury's sense of responsibility for the

verdict, and thereby undermine "the Eighth Amendment's heightened need for reliability in the determination that death is the appropriate punishment in a specific case." *Caldwell v. Mississippi*, 472 U.S. 320, 323, 105 S.Ct. 2633, 2636–37, 86 L.Ed.2d 231 (1985) (internal quotation marks omitted). Thus, a death sentence may not rest "on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639.

In *Commonwealth v. Baker*, 511 Pa. 1, 511 A.2d 777 (1986), this Court applied the *Caldwell* rule in a situation where the prosecutor argued at length to the jury that, in view of the protracted appeals process, any death sentence would only be carried out, if at all, at a much later date, and only after the appellate courts had made sure that the defendant received a fair trial. *See id.* at 24, 511 A.2d at 789. Likewise, the Court in *Commonwealth v. Jasper*, 558 Pa. 281, 737 A.2d 196 (1999), vacated a death sentence because the trial court had informed the jury that, "[s]omewhere down the line, if you do impose the death penalty, the case will be reviewed thoroughly. And after thorough review the death penalty *may* be carried out." *Id.* at 282, 737 A.2d at 196 (emphasis added). This Court reasoned that the trial court's remark amounted to telling the jurors that, while they may nominally impose a death sentence, the responsibility to decide whether it should be carried out rested elsewhere. *See id.* at 283, 737 A.2d at 197. *See generally Commonwealth v. Chambers*, 602 Pa. 224, 257–63, 980 A.2d 35, 55–58 (2009) (discussing cases). The Court in *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74 (2004), on the other hand, affirmed a death sentence although the prosecutor told the jurors that "you do not by your verdict give [the defendant] the death penalty," and urged them to find that the defendant had "earned" that punishment according to the scheme set down by the Legislature. While *Uderra* disapproved the district attorney's language, it noted that, in context, she was developing the statutory requirements for a death penalty and, furthermore, that the common pleas court

repeatedly admonished the jury concerning its fundamental responsibility for the verdict. *See id.* at 527, 862 A.2d at 95.

Presently, the trial court made a brief, one-time reference to a defense objection being preserved for appeal. Upon sidebar discussion with counsel, the court recognized that it should avoid such references in the future, but declined to award a mistrial. In the context of Appellant's lengthy retrial, this single reference was not so egregious as to have denied Appellant his Eighth Amendment rights. Although the remark may have alerted the jury to the fact that there would be an appeal, it was so brief and generic that it did not tend to undermine the jury's responsibility to determine the appropriate punishment. *See Commonwealth v. Abu–Jamal,* 521 Pa. 188, 210, 555 A.2d 846, 856 (1989) (finding no *Caldwell* violation where the prosecutor made a reference to the appeals process that this Court deemed to be "a generic one"). *See generally Chambers,* 602 Pa. at 264, 980 A.2d at 59 (recognizing that "there is no *per se* rule requiring reversal" at any mention of the appeals process). The trial court's comment, moreover, was unlike the prosecutorial argument in *Caldwell,* in which the district attorney told the jury directly that its decision was "not the final" one. *Caldwell,* 472 U.S. at 325, 105 S.Ct. at 2637. Finally, the fact that the court's remark was made during the guilt phase further distances this situation from that in *Caldwell,* where the offending comments were spoken just before the jury retired to deliberate on the sentence, and the Supreme Court's holding was accordingly predicated on its concern that a capital sentencing jury should "proceed[ ] with an appropriate awareness of its truly awesome responsibility" and of "the gravity of its task." *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646. *See generally Abu–Jamal v. Horn,* 520 F.3d 272, 295–96 (3rd Cir.2008) (declining to extend the *Caldwell* rule to references to the appeals process made during the guilt phase of a bifurcated capital trial). In light of the above, we conclude that the trial court acted within its discretion in denying Appellant's motion for a mistrial.[19]

19. We note additionally that, as in *Uderra,* the trial court later clarified that the jury retained the sole responsibility for determining Appellant's

## 7. Conditions of confinement

 Next, Appellant proffers that he should be awarded a new trial because the conditions of his confinement in the Restrictive Housing Unit ("RHU") of the Bucks County jail were adverse.[20] Appellant also observes that his attorney confirmed on the record that he had had difficulty meeting with Appellant at the jail because of a lengthy process whereby Appellant was brought out of the RHU and guarded by two or three prison guards. Additionally, he notes that, at one point, he requested that the trial court send him back to state prison due to the stress of living in the RHU, and that the court granted this request. Appellant complains, however, that the judge did not sufficiently seek to remedy the conditions at the county jail, which, he maintains, interfered with his ability to participate in his defense, affected his appearance before the jury, and compromised his mental alertness at trial. Appellant indicates, in this regard, that the judge simply noted that it was not her role to determine Appellant's prison status (including whether he should be kept in the RHU), as that was the function of prison administrators, and that she suggested that Appellant contact the president judge or another appropriate person with whom to raise these complaints.[21] Appellant argues that, in justifying its inaction, the trial court cited to a 1970s case from this Court that clarified that the function

punishment. *See* N.T. Feb. 13, 2007, at 177 (reflecting the trial court's penalty phase charge to the jury to "[r]emember that your verdict is not merely a recommendation. It actually fixes the punishment as death or life imprisonment").

20. Appellant asserts that: he was unable to sleep well due to the constant noise made by other prisoners; the meals were of inferior quality and quantity; his cell was too cold; he lacked a towel, wash cloth, and mirror for grooming himself for court appearances; and the mattresses were nearly worn out. *See* Brief for Appellant at 49 (quoting an October 17, 2006, letter Appellant wrote to the trial judge).

21. Appellant states that his attorney ultimately did write a letter to the president judge asking that his prison conditions be ameliorated, and the president judge eventually responded by stating that he had discussed the issue with the prison authorities and was "satisfied that, while the RHU may be less than ideal lodging, it is not a place where sleep is impossible as a result of continuous din." Brief for Appellant at 51 (quoting a letter from the president judge to defense counsel, dated Feb. 5, 2007).

of superintending the treatment and discipline of prisoners rests with the prison itself and the officials who are given supervisory powers, rather than with the courts, *see Commonwealth v. Laird,* Crim. No. 1988–746, at 51 (C.P.Bucks, July 26, 2007) (citing *Commonwealth ex rel. Bryant v. Hendrick,* 444 Pa. 83, 90, 280 A.2d 110, 113 (1971)), but failed to observe that *Hendrick* affirmed the lower court's order granting *habeas corpus* relief to prisoners whose conditions of confinement were so oppressive and inhumane as to violate the Eighth Amendment prohibition against cruel and unusual punishment.

The Commonwealth, in response, stresses that *Hendrick* eschewed a general supervisory role for the courts relative to prison conditions, and alleges that, in the present case, there is no record proof that Appellant's conditions interfered with his ability to participate in his own defense. To the contrary, the Commonwealth asserts that Appellant was present during all of the proceedings and was fully able to participate in them, as demonstrated by numerous on-the-record exchanges between Appellant and the trial court or his defense counsel; that Appellant often conferred with his counsel during pretrial and trial proceedings; and that he spoke directly with the trial court regarding his specific concerns, even prevailing upon the court in one instance to have him remanded to the state prison. The Commonwealth also argues that, even though Appellant's first-degree murder conviction and death sentence had been set aside, he stood convicted of second-degree murder at the time of his pretrial confinement, and hence, the county prison authorities were justified in housing him in the RHU because he was at a higher risk for escape and society's need for protection from him was greater than with a prisoner convicted of a lesser crime.

In *Hendrick* this Court explained that it is not the ordinary function of the courts to superintend the treatment and discipline of prisoners in penal institutions. This is the responsibility of those in charge of the prison itself and those officers, both state and local, who are given supervisory powers. We also emphasize that habeas corpus should not be entertained on the slightest pretext or merely to

correct prison conditions which can be remedied through an appeal to prison authorities or to an administrative agency. But, we do mean that where the conditions of the confinement are so cruel and callous as the evidence in the present case establishes, the courts may grant relief through habeas corpus in order to protect the petitioner's fundamental and basic rights.

*Hendrick,* 444 Pa. at 90, 280 A.2d at 113.

Upon our independent review of the record, we cannot find any indication that the prison authorities responded improperly to Appellant's assertions or that the conditions at the county jail substantially interfered with Appellant's ability to participate in his defense. Furthermore, as indicated by the above passage from *Hendrick,* if Appellant wanted to invoke judicial review to test whether the conditions of his confinement in the RHU violated his fundamental freedoms, it was his burden to file for a writ of *habeas corpus* so that a record could be made on the subject.[22] *Cf. Hendrick,* 444 Pa. at 86, 280 A.2d at 111 (reciting that *habeas* relief was granted based on "exhaustive findings of fact" made following extensive hearings); *Commonwealth ex rel. Ford v. Jeffes,* 260 Pa.Super. 432, 394 A.2d 1004 (1978) (affirming the denial of *habeas* relief for a prisoner seeking transfer from a restrictive unit into the general prison population, where the common pleas court's disposition was rendered after an evidentiary hearing where it received testimony regarding confinement conditions). As Appellant did not invoke such proceedings, there are no findings for this Court to review.

## 8. Shackling of Appellant's legs

Appellant next asserts that he is entitled to a new penalty hearing because the jury may have seen his leg shackles when it returned with its verdict in the guilt phase. Some background information is helpful in evaluating this

22. While the scope of the writ of *habeas corpus* has traditionally been limited to reaching detention that is illegal in the first instance, it was employed in *Hendrick* as a vehicle to obtain prison transfer where the conditions of confinement violated fundamental freedoms.

claim. During pretrial discussions, the trial court notified defense counsel that, for security reasons, it would direct that Appellant's leg shackles remain on during the proceedings. Therefore, the court instructed counsel to position an item in front of these restraints so that they would not be visible to the jury. *See* N.T. Oct. 30, 2006, at 143–44; *see also* N.T. Jan. 29, 2007, at 45–46 (reflecting defense counsel's satisfaction, during *voir dire*, that the shackles had been shielded from view by potential jurors). During jury selection and trial, although Appellant was brought into court in handcuffs and leg shackles, the handcuffs, and sometimes the shackles as well, were removed before the jury entered the courtroom. *See, e.g.,* N.T. Feb. 5, 2007, at 11 (reflecting that Appellant was brought into court and "taken out of handcuffs and shackles").

On Friday, February 9, 2007, the jury received the court's guilt-phase instructions and retired to deliberate. Later that day, it returned to the courtroom and delivered its guilt-phase verdict. After the trial court dismissed the jury for the day, the following exchange took place:

> [Defense counsel]: I would like to put on the record that the defendant appears in leg shackles.
>
> THE COURT: [Counsel], you certainly—for the record, there's a trial bag between him and counsel table and all through this I have given you the opportunity to screen him and you certainly could have done that.
>
> [Appellant]: This just happened.
>
> [Defense counsel]: This was kind of fast.
>
> [Appellant]: I had no option. They refused to take them off. They made me sit down with them on.
>
> THE COURT: Well, they're not visible through the bag I don't believe, but what I would suggest is next week please take steps to screen the table.

N.T. Feb. 9, 2007, at 98–99.

Appellant now contends that he was prejudiced during the sentencing phase because the jurors saw the shackles when

they returned to announce their guilt-phase verdict.[23] He relies upon the district court's conclusion, in vacating his first death sentence, that the use of visible shackles during his first penalty phase violated his due process rights. *See Laird v. Horn,* 159 F.Supp.2d at 101 (collecting cases). That court explained that " 'the sight of shackles ... might have a significant effect on the jury's feelings about the defendant,' " and that the use of such restraints " 'is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' " *Id.* at 100 (quoting *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970)); *see also Deck v. Missouri,* 544 U.S. 622, 629, 125 S.Ct. 2007, 2012, 161 L.Ed.2d 953 (2005) ("The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.").

*Allen* and its progeny addressed the use of physical restraints during the guilt phase of trial; *Deck* extended the *Allen* rule to the penalty phase based on several salient legal considerations articulated in *Allen* that the Court deemed to apply equally within a sentencing framework, including the possibility that restraints might burden the defendant's right to counsel and the need to maintain dignified judicial proceedings. *See id.* at 630–32, 125 S.Ct. at 2013–14.[24] With regard to capital sentencing in particular, the Court emphasized the acute need for reliable decisionmaking, the prospect that the appearance of the offender in shackles might suggest to the jury that the authorities consider him a danger to the community (a statutory aggravator in some jurisdictions), the possibility that the sight of the restraints could adversely affect the jury's perception of the defendant's character, and the impact

---

**23.** Appellant does not raise a guilt-phase claim based in this regard, presumably because the jury had already reached its guilt verdict by the time it allegedly saw the shackles. *See* Brief for Appellant at 56.

**24.** *Deck* also highlighted that the same exception applies as in the guilt phase: a trial court may physically restrain a defendant during the penalty phase if there is a security-based need to do so. *See id.* at 633, 125 S.Ct. at 2014–15.

that all of these factors might have on the jury's ability accurately to weigh all relevant considerations—which are "often unquantifiable and elusive"—when it decides between life and death. *Id.* at 632–33, 125 S.Ct. at 2014.

The circumstances forming the basis for the present claim are distinguishable from those in which the federal courts have found constitutional violations. Here, it is not clear from the record that the jury was able to see the shackles even a single time. The defense had generally complied with the court's directive to interpose a visual barrier so that the jury would not be able to see them. The only point at which the jury may have had a glimpse of the shackles is when it returned to deliver its guilt-phase verdict. At that time, moreover, the trial court noted the presence of a trial bag which had, in its observation, sufficiently shielded the shackles from view. Furthermore, even if the jury briefly saw the leg shackles at that time, this single incident does not raise the same kinds of concerns as those articulated by the Supreme Court in *Deck,* as it was an isolated instance that was temporally separated from the penalty phase, which did not begin until three days later. If we were to conclude that prejudice must be presumed under such circumstances, we would extend *Deck*'s holding beyond its supporting foundation.[25]

## 9. Prosecutorial misconduct

Appellant's next claim is that his death sentence should be set aside due to alleged prosecutorial misconduct. During the penalty phase, Appellant presented the testimony of three expert witnesses, including Dr. Henry Dee, a clinical neuropsychologist. Based on interviews, psychological testing, and a review of Appellant's records, Dr. Dee testified that Appellant suffers from brain damage, attention deficit disor-

---

**25.** Appellant also suggests that the trial court erred by not holding an evidentiary hearing on the matter. *See* Brief for Appellant at 56. His argument lacks clarity, however, as he additionally states that the jurors could not have been questioned about whether they saw the shackles without placing Appellant in an untenable position, but he does not indicate any other line of inquiry that might have been pursued during such a hearing.

der, and the effects of adverse childhood circumstances. Dr. Dee ultimately opined that, on the night in question, Appellant acted under the influence of extreme mental or emotional disturbance. *See* N.T. Feb. 13, 2007, at 73, 79. During cross-examination, the prosecutor developed that Dr. Dee had testified as a defense expert in numerous other capital cases in Pennsylvania and elsewhere. Upon defense objection, the trial court clarified that it would not permit questioning about the details or merits of those other cases, but that the prosecutor could elicit that Dr. Dee had "given the same opinions" regarding other capital defendants. *Id.* at 82. The court then instructed the jury that "your task here is to follow the law as I give it to you with respect to this defendant and these circumstances." *Id.* at 83. Thereafter, the prosecutor referred to a Florida case in which Dr. Dee had testified as a defense expert, and queried:

Q. Again, your testimony or your opinion was that [the defendant in that matter] suffered from a mental condition that substantially impaired his ability to comply with the law. Does that refresh your recollection?

A. Well, that's [the] statutory language in Florida, yeah.

Q. In fact, in that case the court found that your testimony to be [sic] very speculative—

[Defense counsel]: Objection, Your Honor.

THE COURT: Sustained. Members of the jury, again, you will need to follow the standards in this case as to the law.

*Id.* at 86. At the ensuing sidebar conference, counsel moved for a mistrial, which was denied. Instead, the trial court provided an immediate curative instruction.[26]

 Appellant maintains that the court erred in denying his request for a mistrial. He argues that the prosecutor's

---

**26.** The court instructed the jury that Dr. Dee

has been received as an expert in this case. I gave you instructions earlier in the trial regarding expert testimony but I will later give you instructions regarding the manner in which you are to evaluate his testimony. The sole issue before you today is what the penalty should be for this defendant, and you are only to consider the evidence presented in this case and the law as I give it to you.

*Id.* at 89–90.

question violated the precept that prosecutors and trial judges may not tell the jury their personal beliefs about whether a witness is truthful. *See Commonwealth v. Washington*, 554 Pa. 559, 566, 722 A.2d 643, 647 (1998) (trial judge); *Commonwealth v. Grant*, 479 Pa. 74, 81, 387 A.2d 841, 844 (1978) (former district attorney).[27] The Commonwealth answers that the cases that Appellant relies on are readily distinguishable from the present matter, as *Washington* involved a trial judge who offered his personal opinion to the jury that the complainant was a truthful witness and that the version of events to which the defendant's alibi witness testified was improbable, and *Grant* concerned a former Philadelphia District Attorney who testified to his belief that a prior Commonwealth witness in the same case had told the truth; whereas, here, the judge did not express any personal opinion concerning the believability of Dr. Dee's testimony, and neither did the prosecutor or any other witness.

To obtain relief based on alleged prosecutorial misconduct Appellant must show that, "considering all the circumstances of the case, the unavoidable effect of the [comment at issue] was to prejudice the jury against him, causing them to form a fixed bias and hostility toward him such that they could not render a fair and impartial verdict." *Commonwealth v. Keaton*, 556 Pa. 442, 459, 729 A.2d 529, 538 (1999); *see also Commonwealth v. Paddy*, 569 Pa. 47, 83, 800 A.2d 294, 316 (2002) ("It is well settled that prosecutorial misconduct does not occur unless the unavoidable effect of the comments at

**27.** Appellant also proffers that his constitutional rights under the Due Process Clause and the Eighth Amendment were violated because the prosecutor placed before the jury information that he had no opportunity to deny or explain, and the jury was prevented from giving full consideration and effect to all mitigation. *See* Brief for Appellant at 58 (citing *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977) (opinion announcing the judgment of the court), and *Smith v. Texas*, 543 U.S. 37, 38, 125 S.Ct. 400, 401, 160 L.Ed.2d 303 (2004) (*per curiam* )). Whatever the merits of these specific constitutional claims, they are waived, as Appellant did not raise them in his statement of matters complained of on appeal. *See generally* Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge.").

issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict."). Even if we assume, *arguendo*, that the prosecutor overstepped the bounds of proper questioning, it would be difficult to conclude that the trial court abused its discretion in denying the extreme remedy of a mistrial. The prosecutor's question regarding the Florida trial court was objected to immediately, and the trial court provided a timely curative instruction. *See Commonwealth v. Baker*, 531 Pa. 541, 559, 614 A.2d 663, 672 (1992) ("The presumption in our law is that the jury has followed instructions.").

Additionally, the question did not pertain to the present case, but a different matter in which Dr. Dee had testified, and about which the jury had little information. In this respect, we agree with the Commonwealth that the authority cited by Appellant concerning the restriction on judges and prosecutors expressing their own personal opinions concerning witness credibility are of only tangential relevance. It is also worth noting that, on both direct and cross examination, Dr. Dee described in significant detail the information and reasoning that formed the basis for his conclusions regarding Appellant. *See* N.T. Feb. 13, 2007, at 56–78 (direct examination), 90–105 (cross-examination). Considering all of these circumstances, as we must, we do not believe that the prosecutor's single reference to the Florida case, which was subject to an immediate curative instruction, had the "unavoidable effect" of prejudicing the jurors against him and preventing them from rendering a fair and impartial verdict.

## 10. Victim impact evidence

Next, Appellant contends that he is entitled to a new penalty hearing based on the admission of improper victim impact evidence regarding Milano's personal qualities and the effect that his death had on his family. While acknowledging that no victim impact testimony was presented during the penalty phase, Appellant asserts that victim-impact "information" made its way to the jury in several ways,

including: several of Milano's family members sat in the front row of the courtroom's audience section during the trial; the prosecutor noted in her guilt-phase opening statement that Milano had just graduated college and had his whole life ahead of him; Milano's father testified during the guilt phase and related that he spoke with his son at home on the evening of the killing and told him not to stay out too late; a friend of Milano's testified during the guilt phase and indicated that she met with Milano at her house prior to his leaving for the Edgely Inn; the Commonwealth articulated during its guilt-phase closing argument that Milano was a beloved son and brother; and the Commonwealth expressed during its penalty-phase closing argument that the victim's family "had to sit here again and listen to what happened to their son in that [sic] dark, cold woods." Brief for Appellant at 63 (quoting N.T. Feb. 13, 2007, at 125). Appellant maintains that these aspects of the trial violated the rule that victim-impact evidence is prohibited relative to offenses committed prior to the effective date of the Sentencing Code's 1995 amendment that expressly allows such evidence. *See* 42 Pa.C.S. § 9711(a)(2); *Commonwealth v. Tedford*, 598 Pa. 639, 706 n. 28, 960 A.2d 1, 40 n. 28 (2008).

Defense counsel expressly informed the court that he had no objection to any of the victim's family members remaining in the courtroom during trial. *See* N.T. Feb. 5, 2007, at 47. Therefore, any challenge to their presence is waived. Similarly, Appellant did not object to the guilt-phase testimony of Milano's father or friend, nor did he object to the prosecutor's arguments that he now challenges. *See Commonwealth v. Bryant*, 579 Pa. 119, 143–44, 855 A.2d 726, 740 (2004) (observing that the failure to lodge a timely objection to complained-of testimony waives any challenge to that testimony); *Commonwealth v. Powell*, 598 Pa. 224, 252, 956 A.2d 406, 423 (2008) (same as to prosecutorial arguments).[28] Thus, regardless of whether these aspects of the trial could be deemed,

---

28. Appellant did object on hearsay grounds when it appeared that Milano's friend might recount the substance of a discussion that she had had with Milano. This objection was sustained and the prosecutor withdrew the question. *See* N.T. Feb. 5, 2007, at 69.

under appropriate circumstances, to constitute victim-impact "evidence" for purposes of Section 9711(a)(2), Appellant's present challenges to them are not preserved for review.

## 11. Penalty phase instructions

■ Appellant next asserts that the trial court's jury charge in the penalty phase, in which it gave a general definition of mitigation, was erroneous and prejudicial. The court instructed the jury that aggravating and mitigating circumstances are "things that make a first degree murder case either more terrible or less terrible." N.T. Feb. 13, 2007, at 164. Appellant proffers that such an instruction diverts the jury's focus from the defendant to "the case," in violation of the Eighth Amendment's mandate that capital sentencing be an individualized procedure based on a reasoned moral response to the defendant's character and background. *See* Brief for Appellant at 64 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). Appellant acknowledges that this Court has previously rejected an identical claim, *see, e.g., Commonwealth v. King*, 554 Pa. 331, 364, 721 A.2d 763, 779–80 (1998); *Commonwealth v. Saranchak*, 544 Pa. 158, 175–76, 675 A.2d 268, 276–77 (1996), but asks us to revisit the issue and overrule our prior decisions.

Appellant failed to object to the instruction or take exception to it before the jury retired to deliberate. *See* Pa. R.Crim.P. 647(B); *Commonwealth v. Pressley*, 584 Pa. 624, 629–30, 887 A.2d 220, 223–24 (2005). Indeed, as in *Pressley*, the court inquired of counsel whether he wanted any additional instructions or corrections, and he responded, "No, your honor." N.T. Feb. 13, 2007, at 177. Accordingly, this claim is waived.[29]

29. Anticipating waiver, Appellant argues that the judge's instruction amounted to an "arbitrary factor" on which the death penalty was based, in violation of Section 9711(h)(3)(i) of the Sentencing Code. *See* 42 Pa.C.S. § 9711(h)(3)(i) (requiring reversal of death sentences produced by "passion, prejudice or any other arbitrary factor"). As there was nothing arbitrary about the challenged penalty phase instruction,

## 12. Validity of the sole aggravating circumstance

 Next, Appellant maintains that the jury impermissibly found the sole aggravating factor—that he killed Milano in perpetration of the felony of kidnapping—because such finding rested solely on Appellant's kidnapping conviction, and not on the jury's independent conclusion that the evidence proved the aggravator beyond a reasonable doubt. *See* 42 Pa.C.S. § 9711(c)(1)(iii) (requiring aggravating circumstances to be proved beyond a reasonable doubt). He also argues that the evidence was insufficient to support the finding of the (d)(6) aggravator beyond a reasonable doubt.

In the sentencing hearing, the parties stipulated that, at his first trial, Appellant was convicted of kidnapping Milano. *See* N.T. Feb. 12, 2007, at 26 (reflecting the court's explanation to the jury that the stipulation means that the parties agree that Appellant was convicted of kidnapping); N.T. Feb. 13, 2007, at 171 (same). On this basis, the jury was entitled to find that Appellant had, as a factual matter, kidnapped Milano, and that the kidnapping was intertwined with the murder, as the underlying circumstances readily demonstrate. This, in turn, formed an adequate basis for the jury to find the (d)(6) aggravator beyond a reasonable doubt. *See Commonwealth v. Diggs*, 597 Pa. 28, 48, 949 A.2d· 873, 885 (2008); *Commonwealth v. Cousar*, 593 Pa. 204, 236, 928 A.2d 1025, 1044 (2007).

It is also noteworthy that, in addition to stipulating to the conviction itself, Appellant accepted that such conviction constituted an aggravating circumstance for sentencing purposes, arguing to the jury as follows:

> [The prosecutor] told you about the aggravating factors and there's a stipulation to one of them. That's correct but it doesn't end there. As the Judge will tell you once you find an aggravator, you then have to decide how much weight to

our inquiring into the merits of this waived claim under the rubric of statutory review for arbitrary factors would convert statutory review into a device for resurrecting a general rule of relaxed waiver, counter to *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003). *Cf. Chambers*, 602 Pa. at 265 n. 12, 980 A.2d at 59 n. 12 (declining to evaluate, under the rubric of "arbitrary factor" review, an otherwise waived claim sounding in ineffective assistance of counsel).

give it. That's what the law says. So you may find kidnapping because it's stipulated to . . . .

N.T. Feb. 12, 2007, at 22. Thus, "[a]lthough the reasonable doubt standard is indeed applicable to aggravating circumstances, the defense, by stipulating to an aggravating circumstance, effectively declares that the Commonwealth has proved such aggravator beyond a reasonable doubt." *Commonwealth v. Frey*, 588 Pa. 326, 338 n. 11, 904 A.2d 866, 873 n. 11 (2006) (citation omitted). Accordingly, this claim is without merit.

### 13. Lack of proportionality

Appellant's next assertion is that his death sentence is disproportionate under both Pennsylvania law and the Eighth Amendment. Proportionality review refers to judicial review of a death sentence in comparison with the sentences imposed in similar cases. *See Commonwealth v. Gribble*, 550 Pa. 62, 87–89, 703 A.2d 426, 438–39 (1997). Pennsylvania's capital sentencing statute used to require that this Court undertake such review in all death penalty cases: Section 9711(h)(3)(iii) of the statute required reversal of a sentence of death that was "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." 42 Pa.C.S. § 9711(h)(3)(iii) (repealed). This portion of the statute was removed, however, nearly ten years before Appellant's retrial. *See* Act of June 25, 1997, P.L. 293, No. 28, § 1. Appellant argues that his entitlement to proportionality review attached at the time of his offense, and hence, it is presently vested notwithstanding that his retrial occurred after the provision's repealer. Appellant is mistaken, as the "operative event" that triggers entitlement to proportionality review under Pennsylvania's capital sentencing scheme is the imposition of a death sentence, and not the offense itself. *Commonwealth v. Sattazahn*, 597 Pa. 648, 698–99, 952 A.2d 640, 670 (2008). Thus, proportionality review is not implicated in the present case.[30]

30. Insofar as the present claim is separately grounded on alleged ineffective assistance of counsel at his first trial, or on the Eighth

### 14. Cumulative error

Appellant finally contends that he is entitled to both guilt- and penalty-phase relief based upon the cumulative effect of the above allegations of error. This Court has repeatedly held, however, that no number of failed claims may collectively attain merit if they could not do so individually. *See Commonwealth v. Rainey,* 593 Pa. 67, 116, 928 A.2d 215, 245 (2007); *Commonwealth v. Baez,* 554 Pa. 66, 118, 720 A.2d 711, 737 (1998); *Commonwealth v. Murphy,* 540 Pa. 318, 336 n. 6, 657 A.2d 927, 936 n. 6 (1995).

## IV. Statutory Review

Having concluded that there was sufficient evidence to support Appellant's first-degree murder conviction and that none his claims of error entitles him to relief, we must affirm his death sentence unless we find that: (i) it was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3). Upon careful review of the record, we are persuaded that the death sentence was not the product of passion, prejudice, or any other arbitrary factor, but resulted from properly introduced evidence that Appellant intentionally and deliberately killed Anthony Milano. We also conclude that the evidence was sufficient to support the single aggravating factor found by the jury in relation to the killing. Specifically, the fact that Appellant was convicted of kidnapping in connection with the killing provides sufficient evidence to support the aggravating circumstance that Appellant committed the killing in perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6).

## V. Conclusion

For the foregoing reasons, we affirm the judgment of sentence. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of

Amendment alone, *see* Brief for Appellant at 76–79, it is waived, as Appellant did not raise any such issues in his Concise Statement of Matters Complained of on Appeal. *See supra* note 27.

Pennsylvania in accordance with Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i).

Justice GREENSPAN did not participate in the decision of this matter.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.