J-S91040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAEQUAHN TYREE AMMIR JONES | : | |
| | : | |
| Appellant | : | No. 105 MDA 2016 |

Appeal from the Judgment of Sentence December 31, 2015
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007227-2014

BEFORE: FORD ELLIOTT, P.J.E., RANSOM, J., and STEVENS[*], P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED FEBRUARY 24, 2017**

Daequahn Tyree Ammir Jones ("Appellant") appeals from the judgment of sentence entered in the Court of Common Pleas of York County after a jury found him guilty of third-degree murder.[1] Sentenced to 18 to 40 years' incarceration, Appellant challenges two of the court's evidentiary rulings and contends that evidence was insufficient to support his conviction. We affirm.

On September 24, 2014, authorities charged Appellant with criminal homicide[2] and criminal conspiracy to commit homicide[3] in connection with

_____

[1] 18 Pa.C.S. § 2502(c).
[2] 18 Pa.C.S. § 2501(a).

* Former Justice specially assigned to the Superior Court.

the fatal shooting of Na'Gus Griggs ("Decedent"), slain as he sat in the passenger seat of a friend's car traveling at the corner of Princess and Pine Streets in York City. With Appellant's jury trial slated to begin on November 2, 2015, the Commonwealth filed a motion *in limine* on October 22, 2015, seeking to introduce evidence of gang activity in the neighborhood. Specifically, the evidence consisted of witness testimony that Appellant and Decedent hailed from rival parts of York City feuding over the shooting death of Appellant's friend at the hands of Decedent's brother. The court ruled the evidence admissible.

On October 29, 2015, Appellant filed a motion *in limine* seeking to preclude admission of several items of evidence submitted in discovery by the Commonwealth one week before trial, including a computer-generated reference map of the crime scene depicting bullet trajectory analysis based on measurements taken a year earlier. The court entertained argument on Appellant's motion and denied Appellant's motion for want of prejudice.

Appellant's jury trial began on November 2, 2015. On the first day of trial, while scrolling through crime scene pictures corresponding to an investigating officer's testimony, the Commonwealth inadvertently flashed on the projector screen a color autopsy photograph of Decedent revealing the entry wound to the back of his head. The next morning, before trial

---

*(Footnote Continued)*

[3] 18 Pa.C.S. § 903.

resumed, Appellant moved for mistrial, arguing that colorization of the wound was inflammatory, the depiction irrelevant—given his self-defense defense—and the resultant prejudice beyond the remedy of a curative instruction. N.T. at 185-86. The court noted that the display was so brief that it escaped the court's observation. The court also acknowledged party agreement that the passing display was accidental and no commentary about the photo was offered. N.T. at 187. Relying on these findings, the court concluded that no prejudice befell Appellant from the momentary showing, and it denied his motion for mistrial. N.T. at 187.

Nevertheless, the court turned to the issue of whether the photograph was admissible, as it was clear the Commonwealth intended to offer it as an exhibit later at trial. *Id*. The court, first, rejected Appellant's irrelevancy argument, finding the depiction of not only the entry wound but also surrounding "stipple wounds"[4] to the back of Decedent's head provided crucial support for the prosecution's self-defense disproof which posited that Decedent could not have been firing at Appellant through an open car window at the time of the fatal shot. N.T. at 187.

Because it also supplied crucial demonstrative evidence, the court continued, the photograph also possessed considerable evidentiary value which exceeded its potential for prejudice. In engaging in the "evidentiary

---

[4] "Stipple wounds" are small cuts caused by numerous tiny shards of glass projected at high-speed when a bullet pierces a window. *See infra*.

- 3 -

value/likelihood of prejudice" balancing test, the court clearly deemed the photograph inflammatory to some degree. Indeed, the court anticipated the photograph could very well upset Decedent's friends and family members and suggested that they be notified outside of the jury's presence that they may wish to leave the courtroom during display of the photograph. N.T. at 187-88.

Nevertheless, the court considered the photographic display of the injury location and pattern colorization of the photograph of sufficient evidentiary value to overcome the potential for prejudicing the jury of a necessarily upsetting depiction, concluding that the photograph was, therefore, not "overly prejudicial." N.T. at 188.

Appellant's final motion with respect to the photograph sought preclusion of a color version in favor of a black-and-white one. The Commonwealth responded that color was necessary because Decedent's wounds would be indistinguishable from moles in a black-and-white photograph. N.T. at 188. The court asked if a black and white version existed to allow for comparison, prompting defense counsel to produce a color copy which, in his opinion, was so pale it "almost looks black and white. It is not." N.T. at 189. After comparing the two, the court found no significant difference between Appellant's and the Commonwealth's copy. They were both "lightly colored," it concluded, and lacking of any "significant prejudice," thus obviating any need for "decolorization" of the

Commonwealth's exhibit. N.T. at 190. Accordingly, the court deemed the autopsy photograph admissible.

At the conclusion of evidence, which consisted primarily of exhibits and eyewitness accounts of the shooting, the case was submitted to the jury. On November 6, 2015, the jury found Appellant not guilty of first-degree murder and guilty of third-degree murder. On December 31, 2015, the court sentenced Appellant to 18 to 40 years' incarceration. This timely appeal followed.

Appellant presents the following questions for our review:

I. **WHETHER THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS COMMONWEALTH'S EXHIBIT 33, WHICH IS A COMPUTER GENERATED MAP FROM THE CRIME SCENE, DEPICTING MEASUREMENTS AND THE TRAJECTORY OF A BULLET; THE MAP WAS PROVIDED TO THE [APPELLANT] ON OCTOBER 26, 2015, AND INTRODUCED TO COUNTER THE [APPELLANT'S] SELF-DEFENSE CLAIM?**

II. **WHETHER THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING THE [APPELLANT'S] MOTION FOR MISTRIAL IN WHICH THE [APPELLANT] RAISED HIS OBJECTION TO A COLOR PHOTOGRAPH, EXHIBIT 27, OF THE VICTIM FROM THE AUTOPSY?**

III. **WHETHER THE COMMONWEALTH'S EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY'S VERDICT OF GUILTY OF MURDER IN THE THIRD DEGREE?**

Appellant's brief at 4.

In Appellant's first issue, he contends that the trial court abused its discretion in denying his motion to suppress Commonwealth exhibits depicting computer-generated, scale drawings of the crime scene delineating a bullet's trajectory based on the height of the entry and exit bullet holes in the barbershop downspout and the angle connecting the two holes.

In considering Appellant's challenge to the trial court's denial of his motion *in limine*, we employ a well-settled standard of review:

> When reviewing the denial of a motion in limine, this Court applies an evidentiary abuse of discretion standard of review.... It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." [**Commonwealth v.**] **Rivera**, 983 A.2d [1211,] 1228 (citation and quotation marks omitted). Thus, the Superior Court may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. **Commonwealth v. Laird**, 605 Pa. 137, 988 A.2d 618, 636 (Pa. 2010). A determination that a trial court abused its discretion in making an evidentiary ruling "may not be made 'merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.'" **Id**. (quoting **Commonwealth v. Sherwood**, 603 Pa. 92, 982 A.2d 483, 495 (Pa. 2009)). Further, discretion is abused when the law is either overridden or misapplied. **Commonwealth v. Randolph**, 582 Pa. 576, 873 A.2d 1277, 1281 (Pa. 2005).

**Commonwealth v. Hoover**, 630 Pa. 599, 610, 107 A.3d 723, 729 (Pa. 2014).

As noted above, the court heard argument on the parties' respective motions *in limine* on the morning of trial. Included among these was Appellant's motion to preclude evidence consisting of a computer-generated

- 6 -

map depicting ballistics trajectory analysis that, *inter alia*, discredited Appellant's self-defense theory alleging Decedent fired the first shot.[5] Initially, defense counsel refined the motion by abandoning his written request for a continuance and asking solely for "suppression" of the map and accompanying analysis.  N.T. 11/2/15 at 15.  He, then, advanced an argument sounding in unfair prejudice, stating "I very briefly spoke to my expert about [the map] on the phone last week after I received it.  I haven't had an opportunity to follow up on that to see if that's [the map] accurate.  So, I would just ask that the Commonwealth be prohibited from using that at trial."  N.T. at 15.

The trial court confirmed with defense counsel that he had forwarded the map and analysis to his expert a week earlier and then asked "Has your expert complained to you that he doesn't know what to do now that he has gotten this document so late he is prejudiced?"  N.T. at 18.  Defense counsel answered simply "No."  *Id.*  The court thereafter denied Appellant's motion, determining that prejudice did not flow from the recent date of the exhibit's delivery.

_____

[5] Appellant's self-defense theory had sought to establish, from a bullet hole in a nearby downspout, the respective positions of Decedent's vehicle and Appellant in such a way as to attribute the first gunshot to Decedent.  The trajectory analysis of the bullet hole, however, ruled out the Decedent's vehicle as a possible origination point of gunfire causing the hole.  N.T. at 16.

Our review of the record discloses no grounds to overturn the court's denial of Appellant's motion, as Appellant failed to establish prejudice requisite to a reversal. The fact that the evidence in question would likely figure prominently in the Commonwealth's case against Appellant's defense theory of self-defense did not, alone, establish unfair prejudice when defense counsel never alleged in his truncated motion that his expert had insufficient time to review the map and trajectory analysis in order to develop a defense response. This claim, therefore, fails.

In Appellant's second issue, he asserts that the court erred in denying his motion for mistrial after the prosecutor, while developing the testimony of the crime scene technician, momentarily displayed a color autopsy photograph on the projection screen as he was scrolling to a crime scene photograph. Specifically, the court erred when it failed to consider whether the photograph was inflammatory or if it was essential evidence that could not be conveyed with a black-and-white photograph. We disagree.

We review the denial of a motion for mistrial under the abuse of discretion standard. ***Commonwealth v. Travaglia****,* 28 A.3d 868, 879 (Pa. 2011) (citation omitted). "A mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial." ***Id.*** (citation omitted).

As noted, *supra*, the trial court first determined that no prosecutorial misconduct accompanied what the parties agreed was an accidental display of the color autopsy photo. The court denied Appellant's motion for mistrial

to the extent that it was based on an allegation of intentional misconduct on the part of the Commonwealth. We have reviewed the record in this regard and discern no error with the court's judgment.

Appellant asserts additionally, however, that the court erred in its subsequent determination that the photograph was admissible later at trial to illustrate so-called "pseudo-stippling"[6] injuries sustained by Decedent. When considering the admissibility of photographs of a victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:

> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003) (citation omitted). In order to render a photograph inflammatory, the depiction must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective assessment of the guilt or innocence of the defendant. *Commonwealth v. Hubbard*, 372 A.2d 687, 697 (Pa. 1977). However, "[t]he fact that blood is visible does not necessarily require a

_____

[6] "Psuedo-stippling" injuries consist of numerous pinpoint cuts formed when a bullet pierces a nearby window and propels small glass fragments along its path to the gunshot victim.

finding that a photograph is inflammatory." **Commonwealth v. Lewis**, 567 A.2d 1376, 1382 (Pa. 1989). Moreover, "[a] court must assure a defendant a fair trial[, and] [a] judge has discretion to give or not give curative instructions." **Commonwealth v. Pezzeca**, 749 A.2d 968, 971 (Pa. Super. 2000).

Here, the court admitted into evidence a color autopsy photograph depicting the back of Decedent's upper torso and head. A single entry wound, surrounded by multiple small cuts in the aforementioned "pseudo-stippling" pattern, is visible in the back of the head as are additional stipple wounds on the upper back and shoulder. Commonwealth Exhibit #27. Decedent's wounds appear red where the skin is broken, but the coloring is moderate in tone. Because Decedent's head is turned slightly to the side, a partial profile view of his face—revealing the edge of his closed right eye and the tip of his nose—is visible, but considerably obscured by shadow.

As explicated above in detail, the court deemed the photograph relevant before shifting its consideration to whether the photograph's evidentiary value was so essential that its need outweighed its potential to inflame the jury. Contrary to Appellant's assertion otherwise, therefore, the court engaged in the proper analysis of this issue.

In addition, we discern no error with the court's conclusion that the Commonwealth's need to support its self-defense disproof with a depiction of both the location and the pattern of Decedent's injuries was comparatively greater than was the potential for prejudice flowing from the admission the

photograph, which was not so inflammatory as to preclude the jury's ability to weigh its value objectively among all the evidence and render an impartial verdict. Finally, we note that the court's cautionary instruction[7] emphasized that the picture, while unpleasant, must not stir emotions to the prejudice of Defendant. Instead, it was the jury's duty to base its decision on a dispassionate review of the evidence, the court appropriately charged. It is well-settled that "the jury is presumed to have followed the court's instructions." *Commonwealth v. Flor*, 998 A.2d 606, 632 (Pa. 2010). For the forgoing reasons, no relief is due on this claim.

In his final issue, Appellant raises a sufficiency challenge to the evidence offered to disprove Appellant's self-defense defense. The Commonwealth failed to disprove that Decedent provoked the use of force in the altercation, Appellant argues, as the evidence established that Decedent traveled to Appellant's neighborhood for the "purported purpose of exacting

_____

[7] Before jury deliberations, the court gave the following instruction:

> **THE COURT:** There was a photograph that was admitted into evidence for the purpose of showing the nature of wounds that were received by Nagus Griggs and to orient Nagus Griggs' body while in the vehicle. It was not a pleasant photograph to look upon and you should not let it stir up the emotions to prejudice of [sic] the Defendant.
>
> Your verdict is based on rational and fair consideration of all the evidence and not on passion or prejudice against the Defendant or the Commonwealth or anybody else connectd with this case.

N.T. at 590.

- 11 -

revenge against [Appellant] for his friends' actions that resulted in [Decedent's] brother being incarcerated." Appellant's brief at 26. Gunshot residue was detected inside the Decedent's vehicle and the firearm "that had been in the vehicle was missing when the police later searched the vehicle," Appellant maintains. *Id.* As a result, Appellant asserts that he "reasonably believed he was in danger of death or serious bodily injury when Decedent initiated the violent encounter by firing a gun at him first."

> Our review of a sufficiency of the evidence challenge is well-settled:
>
> The standard we apply ... is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Truong***, 36 A.3d 592, 597 (Pa. Super. 2012) (*en banc*) (quotation omitted).

Where, as here, a defendant claims his actions were justified by self-defense, he has no burden to prove that claim. ***See Commonwealth v.***

- 12 -

*Smith*, 97 A.3d 782, 787 (Pa. Super. 2014). Rather, once there is any evidence before the factfinder which supports a claim of self-defense, the Commonwealth bears the burden of disproving the claim beyond a reasonable doubt. ***See id.***

The defense, found in Section 505 of the Crimes Code provides, in relevant part:

> **(a) Use of force justifiable for protection of the person.**— The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force.**—
>
> * * * *
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
>> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>>
>> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a), (b)(2). Accordingly, the Commonwealth may disprove a claim of self-defense if it establishes:

> 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

**Smith**, **supra**, 97 A.3d at 787 (quotation omitted).

Here, the Commonwealth presented ample evidence to disprove Appellant's claim that he was under fire and acting in self-defense when he fatally shot Decedent. Nineteen year-old Sonyai Lewis, who knew Appellant from the neighborhood and Decedent from school, testified that she was just a few feet from Appellant when she witnessed him fire the first shot. N.T. at 224-226. Specifically, Lewis recounted that a red, four-door car was traveling on Pine Street when it stopped for a red light at the Pine St./Princess St. intersection. She saw Decedent sitting in the front passenger seat with his window partially down, and then she noticed her neighbors Appellant and Troyvon Breeland approach from across the street, walking behind the car.

Appellant walked directly up to Justin Franklin, who was standing with Lewis, and took a handgun from Franklin's waistband while Breeland twice implored him to "let that thing ring," Lewis testified. N.T. at 227. According to Lewis, Appellant fired the first shot from very close range, which caused Decedent's head to "go to the side." N.T. at 225, 227. She testified that she and other by-standers instantly ran for cover while the sound of additional shots rang in the air. N.T. 225-240.

Justin Franklin corroborated Lewis' account. He testified he possessed Appellant's gun because Appellant had given it to him to hold earlier that

day. N.T. at 254. Appellant quickly retrieved it to open fire on Decedent as the car was making a right turn from Pine onto Princess Street after stopping for a red light, Franklin said:

> **Q:** And can you describe to the jury the details of what exactly happened?
>
> **A:** Um, a car pulled up to the light and then he [Appellant] grabbed the gun and started shooting and I ran.
>
> **Q:** Who grabbed the gun?
>
> **A:** Dae Dae [Appellant].
>
> **\*\*\*\***
> **Q:** And that night did you see anyone else besides Dae Dae fire a gun?
>
> **A:** No, not that I can remember.

N.T. at 251, 255.

Franklin denied seeing Decedent inside the car, as he was talking to the girls on the street corner, although to the best of his recollection the car windows were up as it stopped at the light. N.T. at 262. Franklin heard a total of three or four shots as he ran away from the scene with the others. N.T. at 265.

Officer Jeffrey Mayer of the York City Police Department testified that he processed and collected evidence at the crime scene at Pine and Princess Streets. N.T. at 157-58. Of particular interest was an apparent bullet strike through a downspout and adjacent brick on the Pine Street-facing side of the barbershop building's corner. N.T. at 162; Commonwealth Exhibits #19-24.

- 15 -

Officer Mayer took photographs and measurements of the bullet strike and entered the measurements into a computer program to create a three-dimensional drawing. N.T. at 163; Commonwealth Exhibits #35-37. Trajectory analysis based on the height of the downspout entry hole and the steep angle to the exit hole led to the conclusion that the causative bullet could not have been fired from inside Decedent's car but most probably came from, instead, a gun fired from the Pine Street sidewalk just a few feet away from the corner downspout. N.T. at 179-182, 211-216. This was the location from which eyewitnesses observed Appellant fire at the car.

Police found a handgun deep in the glove compartment of the abandoned car in which Decedent's body lay. They established, however, that the fully loaded weapon was not discharged during the shooting. While gunshot residue recovered from inside the vehicle suggested a gun had been fired from inside the car at some point in time, both experts agreed they could not infer that such gunfire occurred at the time or even on the day in question. Appellant's expert, himself, explained that residue evidence established only that "you can't rule it [that a firearm was discharged from the vehicle at Pine and Princess] in and you can't rule it out." N.T. at 386. Nor could such evidence provide any insight into the order of gunfire between Appellant and the passengers inside the car, if such exchange were assumed *arguendo*. The crime scene yielded no spent casings or other evidence of gunfire originating from the vehicle.

- 16 -

Further corroborating the eyewitness accounts of Appellant as the lone or initial gunman was the testimony of forensic pathologist Michael Johnson, M.D. According to Dr. Johnson, his autopsy of Decedent revealed multiple lesser wounds surrounding the bullet wound to the head. These wounds to Decedent's head and upper right shoulder, called "pseudo stippling," were caused when the fatal bullet first went through the passenger side window and projected small pieces of glass at high speed into Decedent. N.T. at 323-24. This proof of a rolled-up passenger side window made it highly improbable, the Commonwealth argued, that Decedent was hanging out that same window firing shots into the crowd on the corner when Appellant fired at the vehicle. N.T. at 552-53.

Appellant presented the testimony of several witnesses. 21 year-old Leonard Smith testified that he was sitting alone on a porch where neighborhood youth like to meet when he heard a set of two or three shots fired. N.T. at 430. He had been with Troyvon Breeland 30 minutes earlier but left Breeland at a store. *Id.* As he was running away from the porch he heard another two or three shots from "probably a different gun . . . [because] the gunshots [were] way louder." N.T. at 429-30. Smith then clarified that he had seen the first set of shots as coming from the vehicle but did not see where the second set of shots came from. N.T. at 432.

On cross-examination, Smith asserted that he plainly saw Decedent's vehicle slam on its brakes at the corner and open fire, but he did not recall seeing either Troyvon Breeland or Appellant at that location at that time.

N.T. at 432. He could not name anyone who was outside in the area when the shooting happened, even though he admitted he frequented the location. N.T. at 437.

Eyewitness Maria Rodriguez was driving on Princess Street and had just passed through the Pine Street intersection when she heard gunshots and called 911. N.T. at 443. Minutes before the shooting, she said, three people sitting in a long, red, four-door car fitting the description of Decedent's car was behind her on Princess as they approached Pine Street, beeping its horn and swerving impatiently, as if to signal for her to hurry up. N.T. at 444. While she was stopped alongside the barbershop at a red light along, she noticed Decedent's vehicle turn left onto an alleyway running parallel to Pine. N.T. at 445. Moments later, she saw the car on Pine Street stopping at a red light as her light turned green. *Id*.

As Rodriguez drove through the intersection, she looked in her rear view mirror and saw Decedent's vehicle turning quickly back onto Princess in the direction from where they came. *Id*. She wondered what their rush was all about when she heard two gunshots. N.T. at 446. She then saw sparks or a flash coming from inside the car directed toward the barbershop and she kept going to get away from the danger. *Id*.

On cross-examination, the prosecutor refreshed Rodriguez's recollection with a copy of the statement she gave to police at the station on the day of the shooting. Relying on her statement in which she described seeing two rather than three people in Decedent's car, she changed her

testimony to say "I did see two," but insisted that they were "moving around." N.T. at 451. In her statement to police, she also denied seeing sparks or a flash from the car, which caused her to doubt the testimony she had just given:

**Q:** You did not see any sparks?

**A:** I can't remember.

**Q:** If the transcript says you didn't, then does that – was that back when it was fresher in your mind?

**A:** Yeah, that was – I mean, that was a lot closer than now.

**Q:** So you don't remember whether you saw sparks now?

**A:** (No audible response).

**Q:** Am I correct?

**A:** I remember sparks from the car. I have it that I don't, but I do remember sparks coming from the car.

**Q:** But you are not sure, are you?

**A:** No.

N.T. at 454-55.

On redirect, Rodriguez read a statement she had given to police during an interview at her home and testified she had indicated shots were fired from the car. N.T. at 456. On recross, defense counsel asked Rodriguez to read a different portion of her statement and then asked if it was not possible that she had attributed shots to the men in the car simply because they had subjected her to their erratic and aggressive behavior just

moments earlier. N.T. at 459-460. After remaining silent for several requests for an answer, Rodriguez said "Well, I am not so sure. I am trying to remember that day." N.T. at 460. Finally, on both recross and subsequent questioning by the court, Rodriguez testified that she heard the first shot and only then looked in her rearview mirror to observe the developing situation at the Princess/Pine intersection. N.T. at 457,463.

Troyvon Breeland, 21 year-old cousin to Appellant and eyewitness to the events at issue, also testified as a defense witness. Breeland said Appellant and he were standing across Pine Street from the barbershop while others were gathered near the barbershop corner. N.T. at 468. Just hanging out while Appellant was texting on his phone, Breeland testified, he saw the same burgundy car he had seen several times that day come down Pine again and begin to turn the corner. N.T. at 468, 471-72. This time, however, he heard someone say something from the car. N.T. at 469. All the car windows were down, Breeland said, which enabled him to see the front seat passenger going toward the glove compartment and then turn toward the crowd while holding a gun. N.T. at 470.

Breeland called Appellant's name as he saw Appellant turn toward Justin and reach for his hip as Decedent leaned out the window holding a gun. N.T. at 471-74. Breeland heard Decedent fire two shots and saw a flicker out of the corner of his eye. N.T. at 472. He turned to check on Appellant and witnessed him take a gun from Justin Franklin's pants. *Id*. Breeland testified that Appellant "was scared to shoot back[,]" but he

assumed Appellant fired the gun because he "heard three shots go off" as he was running from the scene. *Id*. Breeland also testified that witness Sonyai Lewis also fled the scene when she saw Decedent lean out the window with a gun. N.T. at 476.

On cross-examination, Breeland admitted he had given police conflicting three different accounts of the shooting over the course of the investigation. On the day after the shooting, he told police that he saw nothing and fled at the sound of gunfire, which he could not attribute to anyone. N.T. at 477. On the second meeting with the prosecutor and detective, Breeland was accompanied by counsel when he identified Appellant as the only shooter. According to his statement that day, no shots came from the car and Decedent never displayed a gun. N.T. at 485-86. In his third statement, he modified his account again to say he saw Decedent holding a gun but never saw him shoot it, although he said he may have seen a flicker from the car. N.T. at 486. At trial, Appellant testified that he lied in his first two statements but was now telling the truth. N.T. at 488. He denied trying to restore his reputation in the neighborhood after being labeled a "rat" for naming Appellant as the sole shooter, and he dismissed the notion that he was now covering for his cousin, Appellant. N.T. at 487, 488.

Another inconsistency between Breeland's pretrial and trial versions of the shooting involved the number of men inside the car. Prior to testifying on direct that three men rode in the car, Breeland had told authorities he

saw only two men. N.T. at 481. He explained at trial that he never reported a third man in the back seat because he did not see the man do anything and, therefore, thought that information would be irrelevant. *Id*. He modified his position, however, because the third man may have fired a gun as he saw the man "moving" in the back seat. *Id.* He conceded the prosecutor's follow-up point, however, that by his own definition such an observation, if true, would have made the man "significant" enough to report in the first instance. N.T. at 482.

From this record, we can discern no reason to disturb the jury's determination that the Commonwealth disproved Appellant's self-defense defense to the charge of murder in the third degree beyond a reasonable doubt. While testimonies differed among young witnesses coping with the ever-present threat of rivalry-based, retaliatory violence in their neighborhood, it was within the jury's sole preserve to assess the credibility of these witnesses in carrying out its obligation to make findings of fact. In so doing, it elected to credit the testimonies of the multiple eyewitnesses who accused Appellant of firing a handgun at Decedent without provocation. The forensic evidence, moreover, was consistent with this narrative of an Appellant who chose to fire upon rivals rather than allow them to pass through his neighborhood without conflict. Accordingly, because the evidence as credited by the jury sufficed to convict Appellant of third-degree murder, Appellant's sufficiency claim fails.

For the foregoing reasons, judgment of sentence is AFFIRMED.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/24/2017