J-S22012-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHARLES WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1242 WDA 2022 |

Appeal from the PCRA Order Entered September 15, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0004919-2016

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY OLSON, J.:               **FILED: AUGUST 14, 2023**

Appellant, Charles Williams, appeals from the September 15, 2022 order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546.  We affirm.

In a previous appeal, a panel of this Court summarized the relevant facts of this case as follows.

> Lisa Habedana testified at trial that she watched two black men shoot at a car and run away.  She called 911 and told them a person may have been inside the car.  Next, Brian Kennelly testified that, while attending a family birthday party, he heard a white car running and saw two black men walking toward the car.  [Forty-five] minutes later, he returned to the area to retrieve his cell[ular tele]phone and observed that the same white car was still there.  When he returned once more to the area after the birthday party, he saw that white car had crashed into a curb, the passenger door was open and the body of a deceased man, later identified as Chauncy Howard, was leaning backward in the driver's seat.
>
> Detective Christopher Braden testified that he was investigating an unrelated offense when he heard gunshots.  He was

dispatched to the area of the fleeing suspects. He passed another officer while looking for suspects. He received a radio call from Officer Matt Smith for backup, with the call stating that the suspects were at gunpoint. Officer Smith testified that he responded to a shots fired call and while en route he received an update that males had fled the scene. He stopped and spoke with Jay Ashley who told Officer Smith that Ashley had seen two young black males running. Officer Smith next observed a red jeep with five black males. The jeep took off at a high rate of speed and ran a stop sign. Officer Smith engaged his lights and siren and pursued the vehicle. During this pursuit, Officer Smith observed the back left passenger of the jeep throw a gun out of the window. Two blocks later, the jeep made an abrupt stop and a passenger exited the vehicle and ran. With the assistance of other officers, Officer Smith secured the scene and recovered the gun. He also observed a bag in the car which appeared to him to contain narcotics.

Lorelei Como testified that she lived near the shooting and saw someone jump over her wall and hide on her porch. She called 911 and described the person on her porch as a young black male wearing dark pants and a dark hoodie. The police arrived shortly thereafter.

[Lieutenant] Kevin Faulds testified that he responded to the man on the porch call at Como's residence and discovered Appellant hiding behind a bench on the porch. [Lieutenant] Faulds said that Appellant yelled, "I do [not] have a gun." [Lieutenant] Faulds observed that Appellant was looking from side to side for a possible escape route. Eventually, [Lieutenant] Faulds patted down Appellant and felt what he thought was a folding knife. The item was actually a loaded .380 caliber magazine. The officer also recovered Appellant's cell[ular tele]phone at that time. A canine officer, "Bruno," alerted to a nearby window well where the gun matching the magazine was recovered.

In addition, Detective John Godleski testified as to the evidence he recovered from the scene as part of his duties within the Mobile Crime Unit. [Detective] Godleski collected the weapon which had been thrown from the jeep and stated that a magazine with six live rounds was found in the gun. The gun from under the window well, a [Glock] .380 [] was collected and found to contain a magazine with only two rounds. He also recovered .380 and .40 [caliber] shell casings near the crashed

white Chevy Malibu and a fired bullet from the victim's lap, along with heroin, marijuana, several phones, and $3[,]253.37 in cash from inside the Malibu.

Dan Wolfe of the Allegheny County Crime Lab testified as an expert witness on gun shot residue. A gunshot residue kit was collected from Appellant and sent to the lab for testing. In Wolfe's expert opinion, Appellant was exposed to gunshot residue, meaning he either fired a gun, was near a gun that was fired[,] or came into contact with a surface that had residue on it. William Best, an expert on firearms and tool markings, testified that the Glock .380 was operable. Sara Bitner, an expert in forensic biology, testified that DNA was recovered from the Glock and that Appellant could not be excluded as a contributor to the DNA recovered. She further stated that only 1 in 584,800 African-Americans could not be excluded. She stated that she could not conclude a DNA match between the Glock and Appellant due to the presence of other DNA on the Glock. Dr. Willis Ennis, an expert in forensic patholog[y], determined the cause of death to be multiple gunshot wounds and the manner of death to be homicide.

Detective Ray Murray of the Computer Crime Unit testified that he ran a cell phone dump of the victim's phone which generated an 850[-]page report. Of particular note, the victim and Appellant exchanged text messages shortly before the victim was killed. The last message, "Come outside," was made from Howard's phone at 2:15 p.m. Appellant responded "ait" at 2:22 p.m. The homicide call came in at 2:35 p.m., [13] minutes later.

Rachel Harden testified that she and Howard were in a romantic relationship and that Howard was the father of her child. She testified that Howard was a drug dealer and that he used Appellant as one of his runners. She stated that Appellant and Howard knew each other well and that the two of them appeared in a rap video together. She testified that she told a detective on the date of the murder that Appellant and Howard had an argument the night before.

*Commonwealth v. Williams*, 2020 WL 3397809 *1-*2 (Pa. Super. 2020)

(internal citation omitted).

On January 12, 2016, the Commonwealth charged Appellant with criminal homicide, criminal conspiracy, carrying a firearm without a license, possession of a firearm by a minor, and persons not to possess a firearm. On July 10, 2017, Appellant, along with a co-defendant, Tremond Allston, proceeded to a jury trial. During the July 2017 trial, Appellant's father "approach[ed] one of [the] jurors" and was subsequently charged with "aggravated jury tampering." N.T. Trial, 7/10/17-7/14/17, at 850. The juror was dismissed. Due to media coverage, however, several other jurors learned about the incident. *Id.* at 850-870. As such, mistrials were requested by both defendants, which were granted by the court. *Id.* at 871. Thereafter, the Commonwealth dropped charges against Appellant's co-defendant, Tremond Allston. *See* N.T. Trial, 3/26/19-3/29/19, at 501.

On March 26, 2019, Appellant's second jury trial commenced. On March 29, 2019, the jury found Appellant guilty of third-degree murder, carrying a firearm without a license, possession of a firearm by a minor, and persons not to possess a firearm. On June 24, 2019, the trial court sentenced Appellant to an aggregate term of 260 to 520 months' incarceration, followed by three years' probation. *Williams*, 2020 WL 3397809 at *2. This Court affirmed Appellant's judgment of sentence on June 18, 2020. *Id.* Our Supreme Court denied *allocatur* on January 20, 2021. *See Commonwealth v. Williams*, 244 A.3d 450 (Pa. 2021).

Appellant filed the instant PCRA petition on July 13, 2021. The PCRA court subsequently appointed counsel, who filed an amended PCRA petition

- 4 -

on July 8, 2022. On August 11, 2022, the PCRA court entered an order pursuant to Rule 907 of the Pennsylvania Rules of Criminal Procedure, declaring its intent to dismiss Appellant's petition without a hearing. PCRA Court Order, 8/11/22, at *1 (unpaginated). On September 15, 2022, the court dismissed Appellant's PCRA petition. PCRA Court Order, 9/15/22, at *1 (unpaginated). This timely appeal followed.

Appellant raises the following issue on appeal:

> Did the [PCRA] court err in dismissing Appellant's amended [PCRA petition, which asserted that] trial counsel was ineffective?

Appellant's Brief at 4 (superfluous capitalization omitted).

Our standard of review is as follows:

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions[.]

***Commonwealth v. Mason***, 130 A.3d 601, 617 (Pa. 2015) (citations omitted).

On appeal, Appellant raises claims of ineffective assistance of counsel. "[C]ounsel is presumed effective, and [the appellant] bears the burden of

proving otherwise." ***Commonwealth v. Fears***, 86 A.3d 795, 804 (Pa. 2014), *quoting* ***Commonwealth v. Steele***, 961 A.2d 786, 796 (Pa. 2008). To prevail on an ineffectiveness claim, an appellant must establish:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) [appellant] suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

***Commonwealth v. Lesko***, 15 A.3d 345, 373–374 (Pa. 2011), *citing* ***Commonwealth v. Pierce***, 527 A.2d 973, 975 (Pa. 1987). Failure to meet any prong of the test will defeat an ineffectiveness claim. ***Commonwealth v. Rainey***, 928 A.2d 215, 224–225 (Pa. 2007). Counsel cannot be deemed ineffective for failure to assert a baseless claim. ***Commonwealth v. Payne***, 794 A.2d 902, 906 (Pa. Super. 2002).

To demonstrate prejudice, Appellant must show there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. ***Commonwealth v. Spotz***, 870 A.2d 822, 830 (Pa. 2005). When it is clear that a petitioner's ineffective assistance claim has failed to meet the prejudice prong of the ineffectiveness test, the claim may be dismissed on that basis alone, without a determination of whether the first two prongs have been met. ***Rainey***, 928 A.2d at 224-225; ***Commonwealth v. Albrecht***, 720 A.2d 693, 701 (Pa. 1998) ("If it is clear that [the a]ppellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone

and the court need not first determine whether the first and second prongs have been met."). Herein, Appellant raises two distinct claims regarding trial counsel's alleged ineffectiveness. We will address each of Appellant's claims in turn.

First, Appellant argues that trial counsel was ineffective for failing to object after Detective Robert Shaw testified that another individual, Devon Wade, "identified to [the police officers] that . . . [Appellant] was in the rear of the [red jeep] behind the [front seat] passenger." Appellant's Brief at 17. Appellant claims Detective Shaw's statement was inadmissible hearsay. *Id.* In the alternative, Appellant argues that, even if Detective Shaw's statement were admissible for non-hearsay purposes, trial counsel erred in failing to "ask[] the [t]rial [c]ourt for a [curative] instruction" to warn the jury that Detective Shaw's statement "was not to be used as substantive evidence." *Id.* at 20.[1]

"Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). "As a general rule, hearsay is inadmissible as such evidence lacks guarantees of trustworthiness

_____

[1] In disregard of our appellate rules, Appellant utterly failed to cite to the record or otherwise "reference [] the place in the record where the matter referred to appears." Pa.R.A.P. 2119(c). Hence, we are permitted to deem Appellant's issue waived. *See Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) ("We shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem [the] issue to be waived."). The Commonwealth, however, directed our attention to the relevant section of the trial transcripts. As such, we will consider the merits of Appellant's claim.

fundamental to the Anglo–American system of jurisprudence." ***Commonwealth v. Estepp***, 17 A.3d 939, 945 (Pa. Super. 2011), *citing* ***Commonwealth v. Dargan***, 897 A.2d 496, 500 (Pa. Super. 2006). "However, 'an out-of court statement offered not for its truth but to explain the witness's course of conduct is not hearsay' and thus, is not excludable under the hearsay rule." ***Estepp***, 17 A.3d at 945, *citing* ***Commonwealth v. Rega***, 933 A.2d 997, 1017 (Pa. 2007); ***see also Commonwealth v. Dent***, 837 A.2d 571, 577 (Pa. Super. 2003) ("'[A]n out-of-court statement offered to explain a course of conduct is not hearsay.'"), *quoting* ***Commonwealth v. Cruz***, 414 A. 1032, 1035 (Pa. 1980). In general, a police officer's testimony concerning an out-of-court statement is admissible to explain course of conduct. ***See Estepp***, *supra*; ***Dargan***, *supra*.

Herein, the relevant testimony is as follows:

**[Assistant District Attorney ("ADA") Ramaley]:** Where was Devon Wade in the [J]eep this day?

**[Detective Shaw]:** Devon Wade was the driver of the [J]eep.

**[ADA Ramaley]:** Okay. Through your investigation, were you able to determine whose [J]eep he was driving?

**[Detective Shaw]:** It was his mother's.

**[ADA Ramaley]:** Now, throughout this investigation or earlier this week it was testified that Devon Wade used that [vehicle] as a jitney, is that correct?

**[Detective Shaw]:** Yes.

**[ADA Ramaley]:** Okay. And I think we heard some testimony that [a jitney is] basically an unlicensed taxi, is that correct?

**[Detective Shaw]:** That is correct.

**[ADA Ramaley]:** Ok. Does Devon Wade, does he agree to speak with you guys that day?

**[Detective Shaw]:** Yes.

**[ADA Ramaley]:** And based on his statement, do you make – do you and Detective Abraham make an executive decision as to what you were going to ask the Mobile Crime Unit to do with respect to processing his [J]eep?

**[Detective Shaw]:** Yes.

**[ADA Ramaley]:** Okay. Tell the jury what you decided to have analyzed or not analyzed and why.

**[Detective Shaw]:** Well, based on the information that Devon Wade was giving us, he identified to us that a male passenger named Devon Trowell was in the front seat passenger, a male named Ceejay Jones was in the backseat in the middle, [Appellant] was in the rear of the car behind the passenger, and the other male was behind the driver.

**[ADA Ramaley]:** Did you decide to print the vehicle?

**[Detective Shaw]:** We did not.

**[ADA Ramaley]:** Why?

**[Detective Shaw]:** We had a statement from this individual explaining where everybody was.

**[ADA Ramaley]:** When you say "this individual," you are talking about Devon Wade, right?

**[Detective Shaw]:** Yes.

**[ADA Ramaley]:** And did that statement include this issue of being a jitney?

**[Detective Shaw]:** Yes.

**[ADA Ramaley]:** And what do we know about cars that are used as jitneys?

**[Detective Shaw]:** People in and out. You know, it [is] much different than if you [are] – I mean, you can even equate with [] an Uber driver. They have people coming in and out of the cars all the time.

As you heard earlier, each person that enters a car or sits in them [*sic*] seats, they deposit their own material, whether that be fingerprints, DNA, that [is] kind of where we [are] at.

N.T. Trial, 3/26/19-3/29-19, at 558-560.

Upon review, we conclude that the Commonwealth did not introduce Devon Wade's out-of-court statement regarding Appellant's location in the vehicle for the truth of the matter asserted. Instead, the Commonwealth offered Detective Shaw's testimony, which incorporated Wade's statement, to explain the detective's course of conduct in the investigation of this matter, *i.e.*, why the officers decided not to fingerprint Wade's vehicle. Hence, an objection to Detective Shaw's testimony as offering inadmissible hearsay lacked merit. "As counsel will not be deemed ineffective for failing to raise a meritless claim, [Appellant] is not entitled to relief on this issue." ***Commonwealth v. Spotz***, 896 A.2d 1191, 1222 (Pa. 2006).

Appellant, however, also challenges trial counsel's failure to request a curative instruction following Detective Shaw's testimony. Appellant's Brief at 20. The purpose of such an instruction would be to prevent the jury from considering Wade's incorporated out-of-court statement as substantive evidence. ***Id***. Because Wade's statement as relayed by Detective Shaw was "the only evidence that placed Appellant in the red [J]eep," Appellant argues that trial counsel lacked a reasonable basis for failing to request the issuance of a cautionary instruction, and that trial counsel's failure prejudiced him. ***Id***. at 18; ***see also id.*** at 22-24. We disagree.

- 10 -

"It is well-settled that evidence which is admitted for a limited purpose must be accompanied by a limiting instruction to focus the jury's consideration of the evidence to its appropriate purpose." ***Commonwealth v. Coleman***, 230 A.3d 1042, 1048 (Pa. 2020). It is, however, equally "well[-]settled that the decision whether to seek a jury instruction implicates a matter of trial strategy." ***Lesko***, 15 A.3d at 402. Indeed, our Supreme Court has recognized that

> "[c]ounsel are not constitutionally required to forward any and all possible objections at trial, and the decision of when to interrupt oftentimes is a function of overall defense strategy being brought to bear upon issues which arise unexpectedly at trial and require split-second decision-making by counsel." [***Spotz***, 870 A.2d at 832]. Under some circumstances, trial counsel may forego objecting to an objectionable remark or seeking a cautionary instruction on a particular point because "[o]bjections sometimes highlight the issue for the jury, and curative instructions always do." ***Id.***

***Commonwealth v. Koehler***, 36 A.3d 121, 146 (Pa. 2012) (parallel citations omitted).

A review of the trial transcripts reveals that, as a matter of trial strategy, trial counsel sought to cast doubt upon the Commonwealth's case, as well as Devon Wade's credibility, by highlighting the extent of the Commonwealth's reliance on Wade and contrasting that with Wade's absence during Appellant's trial. This was evidenced during Detective Shaw's cross-examination which, in relevant part, is as follows:

> **[Defense counsel]:** Okay. So[,] what we have is a car pulled over with five individuals in it. [] Wade was driving, right?

**[Detective Shaw]:** Yes.

**[Defense counsel]:** And you [have] been in the courtroom for this entire trial, and you heard the gunshot residue expert testify that the only other person besides [Appellant] that was positive for gunshot residue was [] Wade, did you not?

**[Detective Shaw]:** Yes.

**[Defense counsel]:** Okay. So[, Wade] is driving a vehicle that is stopped shortly after the homicide and he is charged with robbery and conspiracy, but has yet to come to trial on that. Is that all fair?

**[Detective Shaw]:** Yes.

**[Defense counsel]:** Okay. The passenger was [Devon] Trowell?

**[Detective Shaw]:** Front seat passenger was Devon Trowell.

**[Defense counsel]:** And he was a cousin [of] Wade's?

**[Detective Shaw]:** Correct.

**[Defense counsel]:** And he is deceased?

**[Detective Shaw]:** Yes.

**[Defense counsel]:** As you sit here today knowing the statements you were given by [] Wade, we do [not] know who the person was behind the driver, do we?

**[Detective Shaw]:** That matter is under investigation and there are – to use the cliché term – persons of interest that acted in connection with [Appellant].

**[Defense counsel]:** Right. And the investigation is ongoing. We [have] been told that by [ADA] Ramaley.

**But through your investigation, other than [] Wade's testimony or statement to you that [Appellant] was in the backseat of that [J]eep, what evidence is there that my client was ever in the [J]eep or jumped out of the [J]eep?**

**[Detective Shaw]: Other than the statements, nothing.**

**[Defense counsel]: Other than the statements that were from a person we know now lied to you and perjured himself?**

**[Detective Shaw]: Correct.**

N.T. Trial, 3/26/19-3/29/19, at 587-588 (emphasis added).

Then, during defense counsel's closing statement, he argued:

[Daniel] Wolfe testified about gunshot residue. Now this is where I [am] done. I [am] like Admiral Stockdale at the Vice[-]Presidential Debate. Who am I and why I am I here?

Because [Appellant] has gunshot residue on his hands, he [is] apprehended close in time, a half a mile away from the shooting. He did it. This case is open and shut. Except that their own expert testified there are more than one way you get gunshot residue on your hands.

Specifically, if you fired a gun, if you handled a gun, if you were near a gun that had been fired or if you touched – I [am] sorry, came into contact with the surface with gunshot residue on it.

How did [Appellant] get gunshot residue on his hands? Let me see which eyewitness called by the Commonwealth has my client shooting Chauncy Howard.

That [is] where I [am] guilty of being obnoxious or abrasive again. They do [not] have one. They do [not] have a statement from anybody that came in here, took the stand, swore an oath and told you [Appellant] shot and killed Chauncy Howard. Not one.

**They can [not] call Devon Wade, who is the most damning witness against my client back in January of 2016 because he [is] a perjurer and a liar.**

That [is] why that young man in the back row after being prosecuted for 30 months, his case had to be nol-prossed because their witnesses lied to Detective Shaw, because they perjured themselves in the courtroom in 2017.

**Does that give you reason to pause or hesitate about [Appellant's] guilt? I submit that it should. It will. And that, ladies and gentlemen, is reasonable doubt.**

- 13 -

*Id.* at 715-717 (emphasis added). Counsel continued, further stating:

> [Sara] Bitner testified [about] my client's DNA, the Commonwealth will tell you that her testimony equates to [Appellant's] DNA is on a [Glock] 380 they found in close proximity to him when he [is] found in close proximity to the murder, close in time. Open and shut. He shot Chauncy Howard. Except there [are] no 380 bullets in Chauncy Howard.
>
> The bullets recovered from a [Glock] 380 are in the car coming from the outside of the car toward the car, except that their own expert under cross-examination admitted that there is additional testing that could have been done because their expert's final word, this young man is, and I quote, not excluded as a contributor.
>
> Does that give you reason to pause or hesitate about his DNA on that firearm? There [is] a mix sample. All kinds of people handled that firearm. That [is] why she can [not] say with anymore certainty than [one] in 584,000 he [is] not excluded.
>
> And the government during their direct suggested to you, through her that, well, we got to get almost 600,000 people together before we can find one more person that we can label as not excluded.
>
> And [] Bitner on cross said, [n]o, that [is] not accurate. The very next person through that door could be labeled not excluded based on the policy of the Allegheny County Office of the Medical Examiner.
>
> She admitted that they have, the government, sent mixed sample to other institutions for further testing. They did not in this case. Maybe because they had witnesses that said [Appellant] did it. But they do [not], and the DNA evidence in this case should cause you to pause or hesitate.
>
> **Devon Wade, the liar and perjurer that they did [not] call this time, I guess because maybe they did [not] want me to be able to cross-examine him or they did [not] want him to lie to the 13 of you, I do [not] know, but he had gunshot residue on his hands as well. It does [not] matter. It does [not] matter that Tremond Allston did [not] and they still prosecuted him.**

- 14 -

*Id.* at 717-719 (emphasis added).

Based upon the foregoing, it is apparent that, as a matter of strategy, trial counsel attempted to use the Commonwealth's failure to call Devon Wade as a witness during Appellant's trial to undercut Wade's credibility and, in turn, call into question the veracity of his statement which placed Appellant in the backseat of the red [J]eep on the day in question. Hence, counsel could have reasonably believed that requesting a curative instruction following the introduction of Devon Wade's statement by Detective Shaw would undermine his effort to cast doubt on the Commonwealth's case by emphasizing the extent of the prosecutor's reliance on an untrustworthy witness such as Wade. Thus, it cannot be said as a matter of law that trial counsel lacked a reasonable basis in deciding not to request a jury instruction following the reference to Wade's statement during Detective Shaw's testimony.

Moreover, Appellant's claim of error fails for lack of prejudice. *See* ***Spotz***, 870 A.2d at 833 ("Absent a showing of such prejudice, the claim of ineffective assistance fails."). Even without the introduction of Wade's statement through Detective Shaw, the Commonwealth presented ample evidence demonstrating Appellant's guilt, including,

> [c]ell phone evidence [placing] Appellant at the crime scene. Gunshot residue [was found on Appellant's person, Appellant's] DNA [was found on the discarded gun, Appellant was found in possession of a] .380 [caliber] clip with missing cartridges, [a] .380 [caliber firearm was] found discarded in the window well near where Appellant was hiding[, and .380 caliber cartridge casings were found at the murder scene].

***Williams***, 2020 WL 3397809 at *3.  Accordingly, we conclude that Appellant is not entitled to relief on this claim.

Second, Appellant takes issue with trial counsel's cross-examination of Rachel Harden, the victim's paramour, claiming that he "open[ed] the door to the prior mistrial."  Appellant's Brief at 24.  This cross-examination, per Appellant, resulted in the trial court's issuance of a prejudicial cautionary instruction to the jury.  ***Id***. at 28.[2]  We disagree.

The issue arose because of the following testimony and sidebar discussions:

> **[Defense counsel]:**  You want justice for Chauncy Howard. That [is] why you are here today?
>
> **[Rachel Harden]:** Yes.
>
> **[Defense counsel]:**  That [is] why despite being a thief, a liar and a drug dealer, you are telling these 14 citizens the truth today.
>
> **[Rachel Harden]:** Yes, I am.
>
> ***
>
> **[Defense counsel]:** Did you want the same thing when you testified against Tremond Allston?
>
> **[ADA Ramaley]:** Your Honor, may we approach?
>
> **The court:** Yes.
>
> (A discussion at sidebar was held as follows).
>
> **[ADA Ramaley]:** [] Harden did not testify against Tremond Allston and, in fact, stated she did not know him, and with that,

---

[2] The Commonwealth, not Appellant, directed this Court's attention to the relevant trial transcripts.  Again, we admonish Appellant for his failure to provide any citation to the record in violation of Pa.R.A.P. 2119(c).

I submit that [defense counsel] opened the door to the last trial and what happened at the last trial, it was his client that caused the mistrial.

**The court:** It was his client.

**[Defense counsel]:** It was my client's father.

**The court:** It was not – that part is not – he did not open the door to that. He will be corrected, I [am] sure, on re-redirect because that error in his questioning can [not] go without challenge. At this point, I think, [defense counsel], on the issue of whether she is testifying truthfully, you have made your point and I will sustain the Commonwealth's objection. You are not being argumentative with regard to that issue.

**[Defense counsel]:** Yes ma'am.

**[ADA Ramaley]:** Your Honor, I [am] going to ask for the testimony that was testified at the last trial be entered into evidence.

**The court:** Her testimony?

**[ADA Ramaley]:** Her testimony. She said today about [Appellant], but did [not] say anything about Tremond Allston. We can consider it and think about it for tomorrow morning.

**The court:** Yes.

**[ADA Ramaley]:** That [is] fine.

**The court:** Thank you.

(The discussion at sidebar concluded.)

N.T. Trial, 3/26/19-3/29/19, at 455-458 (superfluous capitalization omitted).

On re-redirect, Harden clarified that she did testify during Appellant's first trial, but did not testify against Tremond Allston, as she did not know him. *Id*. at 458-459. During a subsequent discussion at sidebar, the following exchange occurred:

- 17 -

**[ADA Ramaley]:** Your Honor, I ask also the court to consider the issue as to whether we can now put in what happened at the prior trial because [defense counsel] has opened the door to the fact that there was a prior trial and –

**[Defense counsel]:** That door was open in openings. The door has been open since the beginning of trial.

What happened by a third party other than my client is not relevant to this trial.

**The court:** Out of an abundance of caution, I am going to consider that over the evening hour, but it is my position, as I stated earlier, that the reason for the earlier mistrial – that door has not been opened. The reason for it, it is possible that I will consider allowing the Commonwealth to introduce evidence of the earlier proceeding ending in a mistrial, but that it would be – that it be specifically tailored . . . or you can reach a stipulation that the earlier trial ended in a mistrial, that through no fault of the Commonwealth or something to that affect.

**[Defense counsel]:** Or the defendant.

**[ADA Ramaley]:** Your Honor – no. I mean[,] that [is] the point.

**The court:** Yeah, I do [not] – I do [not] want to go that far in the stipulation because –

**[Defense counsel]:** His father pled to jury tampering.

**The court:** I know.

**[Defense counsel]:** There was no testimony that [Appellant], who was incarcerated at the time, instructed him to do that or participated in it.

So[,] I understand why there was a mistrial, but they can [not] put it on [Appellant].

**The court:** I am not going to allow them to put it on [Appellant].

**[Defense counsel]:** Okay.

**The court:** But I am probably not going to allow the ultimate statement that through no fault of [Appellant] –

> **[ADA Ramaley]:** Your Honor, I would like to supplement with in opening, I personally made a point of not saying trial. I said we arrested and prosecuted. I did not say go to trial. So prosecuting means just filing charges, one and, two, it has been alluded over and over again in his opening argument and throughout his case that the reason this case, this trial went before was because of the fact of Tremond Allston – we falsely filed charges against Tremond Allston, and for purpose of the record, that is absolutely incorrect. That the evidence that ultimately caused the Commonwealth to withdraw charges on Tremond Allston came months after the mistrial.
>
> **The court:** That is an accurate statement. So I think I [will] consider this and I would urge the parties to consider it as well, that it would certainly be better for the two attorneys to present through stipulation to the jury some explanation for why there was a prior trial now that – instead of using the term proceedings, I think [defense counsel] did specifically say, "[Y]ou testif[ied] at the trial, at the earlier trial against [] Allston," because that often does raise in the jury "what happened, was the prior jury hung," because they do [not] necessarily understand mistrial.

*Id.* at 461-464 (superfluous capitalization omitted).

Ultimately, the Commonwealth and defense counsel reached a stipulation, and the trial court issued the following instruction to the jury:

> In July of 2017, the cases of Commonwealth versus [Appellant] and Commonwealth versus Tremond Allston proceeded to a jury trial.
>
> Prior to closing arguments, the trial resulted in a mistrial through no fault of the Commonwealth or any of the Commonwealth's witnesses.
>
> The subsequent withdrawal of charges against Tremond Allston was unrelated to the mistrial.

*Id.* at 500-501.

Upon review, we conclude that Appellant's claim fails for lack of prejudice—and does so for two reasons. First, in arguing that the trial court's instruction was "inherently prejudicial," Appellant assumes, without any substantiation, that "the phrase 'through no fault of the Commonwealth or any of the Commonwealth witnesses[,]' would lead the jurors to suspect [the mistrial] was through the fault of [] Appellant" and, in turn, lead the jurors to "view that as consciousness of guilt." Appellant's Brief at 28-29. Not only is Appellant's claim utterly speculative, but it is also untrue. A mistrial may occur for multiple reasons. In fact, in this instance, the mistrial was not specifically caused by Appellant or Appellant's father's attempted tampering, but because other jurors learned of Appellant's father's actions from news reports. Moreover, as Appellant's claim is inherently speculative, he is unable to make the requisite showing of prejudice, *i.e.*, that but for counsel's error, the outcome would have been different, particularly in view of the compelling evidence of guilt offered by the Commonwealth. ***Spotz***, 870 A.2d at 830.

Second, at the conclusion of Appellant's trial, the trial court issued additional jury instructions, including that the jury were required to "base [their] decision strictly on the evidence in this case" which consisted only of "the testimony of the witnesses which [they] heard and the exhibits which [they saw] introduced." N.T. Trial, 3/26/19-3/29/19, at 751; ***see also id.*** at 755 (the court explaining that "it was for [the jury] and [the jury] alone to decide the case based on the evidence as it was presented and in accordance with the[] instructions" issued). In so doing, the trial court directed the jury

- 20 -

to evaluate Appellant's innocence or guilt based only upon the evidence presented at the current trial, not speculation as to the cause of a prior mistrial. "It is settled law that, absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions." *Commonwealth v. Laird*, 988 A.2d 618, 629 (Pa. 2010). Appellant does not point to any evidence to the contrary. Appellant, therefore, is not entitled to relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/14/2023